**CHATHAM STEEL CORPORATION,
et al., Plaintiffs,**

v.

**C. BROWN and Mandy Sapp,
et al., Defendants.**

Civ. A. No. 93–50064/LAC.

United States District Court,
N.D. Florida.

July 19, 1994.

Phillip A. Bates, Pensacola, FL, Robert N. Steinwurtzel, Washington, DC, for plaintiffs.

American Iron & Metal Co., Inc., William Melnick, Registered Agent, Atlanta, GA, Michael W. Kehoe, Fuller, Johnson & Farrell, Pensacola, FL, Karen Aldridge Crawford, Nelson Mullins Riley & Scarborough, Columbia, SC, Bob W. Pittman, Jr., James C. Pittman, Jr., Montague & Pittman, Hattiesburg, MS, Michael D. Smith, Wilson, Harrell & Smith, Pensacola, FL, Sidney F. Ansbacher, Brant, Moore, Sapp, MacDonald & Wells, Jacksonville, FL, Gilbert Keith Murphy, Moultrie, GA, Dan A. Aldridge, Jr., Atlanta, GA, Alan Rhodey, Pensacola, FL, Mark Upton, Richardson, Daniel, Spear & Upton, Mobile, AL, Clifford W. Sanborn, Barron, Redding, Hughes, Fite, Bassett & Fensom, Panama City, FL, Louie M. Bishop, Waynesboro, MS, Tim E. Sleeth, Herschel T. Vinyard, Jr., Smith, Hulsey & Busey, Jacksonville, FL, John W. Fleming, Pensacola, FL, George Ward Hendon, E. Thomison Holman, Adams Hendon Carson Crow & Saenger, P.A., Asheville, NC, Norton Bond, Pensacola, FL, Bert Moore, Moore, Kessler & Moore, Niceville, FL, W. Thomas Howard, Registered Agent, DeMark, Inc., Knoxville, TN, Stephen B. Shell, Shell, Fleming, Davis & Menge, Pensacola, FL, George Miles Stark, Posey Distributing Co., Inc., Tampa, FL, Robert A. Anderson, Tampa, FL, Robert E. Clute, Jr., Mobile, AL, Arthur Baron, Orlando, FL, William N. Asma, Asma & Wright, P.A., Winter Garden, FL, Bradford W. Wyche, Wyche,

Burgess, Freeman & Parham, P.A., Greenville, SC, Charles Wynn, Marianna, FL, Carl Gibson, Sr., Fountain Inn, SC, Bennie Hickman, Gulfport Scrap, Biloxi, MS, K. Olin Miller, Atlanta, GA, J.M. Warren, Athens, GA, Keith Begin, St. Petersburg, FL, William F. Cowley, Mobile, AL, Karl R. Steinberger, Colingo, Williams, Heidelberg, Steinberger & McElhaney, Pascagoula, MS, Kenneth Hosford, Tallahassee, FL, William Lamb, Theodore, AL, Ruth Lamb, Esto, FL, for defendants.

### ORDER ON SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

COLLIER, District Judge.

Plaintiffs seek recovery under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) for costs they have incurred and will continue to incur in cleaning up the "Sapp Battery" Superfund Site near Cottondale, Florida. Plaintiffs Chatham Steel, Dixie Rubber & Metal and Jackson Iron & Metal are among a group of fifty-seven companies who signed a consent decree with the United States obligating them to conduct and finance the clean up of contaminated soil at the Site. Defendants in this action are a group of companies and individuals identified by the United States and Plaintiffs as potentially responsible parties (PRP's) under CERCLA. Plaintiffs have moved for summary judgment against 36 defendants on the issue of liability under § 107. A number of these defendants have, in turn, filed cross-motions for summary judgment.

The defendants answering this motion have raised several common arguments against liability under § 107. In particular, Defendants claim they did not "arrange for" the disposal or treatment of hazardous substances as defined in § 107(a)(3) of CERCLA. This order will first address these common defenses by reciting the uncontested facts relevant to all defendants and analyzing the legal issues regarding "arranger" liability under § 107(a)(3). Several defendants have also raised defenses unique to their circumstances. The facts and analysis relevant to these defendants will be set out in part II of this order.

### Factual Background

In 1970, Sapp Battery Salvage Service, Inc. began recycling spent lead-acid batteries at its 53–acre site near Cottondale, Florida. The company, initially owned and operated by C. Brown Sapp, purchased spent batteries, cut them open with an antique hay baler, and recovered the lead to sell to lead smelters. During this process, acid from the batteries spilled on the ground and flowed uncontrolled across the Site. Meanwhile, the company dumped the cut battery casings—contaminated with lead—in the northern portion of the Site. In the beginning, the company processed between 600 and 800 batteries a week at the Site.

Sometime in 1973, C. Brown Sapp's son, Jerry Sapp, began taking over the business from his father. Jerry Sapp disposed of the casings and acid in much the same fashion as his father. By that time, however, the business had grown to where it employed approximately twenty-five truck drivers who travelled throughout the southeastern United States collecting spent batteries. Three years later, in 1976, the company was processing approximately 5,000 batteries a week at the Site. In 1978, Jerry Sapp finished acquiring from his father the land on which the Site is located. That same year, Jerry Sapp incorporated the business as "Sapp Battery Services, Inc."

By 1979, the company reached the peak of its operations. At the time, the company was cutting around 5,000 batteries a day and purchasing batteries through brokers as well as directly from businesses. The company continued to drain large quantities of battery acid directly into a swamp on the Site. Meanwhile, plastic casings were shredded and buried throughout the property. Beginning in spring 1978, Sapp's disposal methods began drawing the attention of the Florida Department of Environmental Regulation after neighbors complained of acidic runoff from the Site.

The defendants in this motion are companies who sold batteries to Sapp between 1978 and 1980. When purchasing batteries, Sapp typically initiated the purchase by calling

sellers to inquire whether they had any batteries to sell. If a seller had a load of batteries to sell and the parties could agree on a price, Sapp sent one of its trucks to the seller's business to pick up the batteries. At pick up, the batteries would be weighed and Sapp's truck driver would pay for the load with a check or cash. Sapp paid for the batteries by the pound, and the price was determined by the price of lead on the secondary metals market. Once the batteries were loaded and paid for, the seller retained no interest in the batteries and had no control over Sapp's operation.

Though Sapp purchased batteries directly from battery shops and scrap yards, it also purchased batteries through battery brokers like Blattner Metals of Jacksonville. A number of companies who sold batteries through brokers are defendants in this suit and in this motion. When Sapp bought batteries from brokers, it paid the broker for the batteries. Sapp, however, collected the batteries directly from the businesses providing the batteries to the broker. When picking up batteries, whether at companies who sold directly to Sapp or through a broker, Sapp drivers always identified themselves to the sellers. Likewise, Sapp's trucks bore the company's name in plain view.

In January 1980, Jerry Sapp abruptly shut down the company and effectively walked away from the Site. Thereafter, the Environmental Protection Agency (EPA) became involved and in 1982 the Site was placed on the National Priorities List. After a decade of study and clean up, the EPA issued a Unilateral Administrative Order pursuant to § 106 of CERCLA requiring the recipients of the order, including many of the plaintiffs and defendants in this action, to cleanup the Site. In 1993, Plaintiffs, along with fifty-four other PRP's, entered into a consent decree with the United States governing the cleanup. Under the terms of the consent decree, these PRP's agreed to repay the United States for costs it incurred at the site as well

as conduct the remaining cleanup. After entering into this agreement, Plaintiffs contacted the PRP's who had not entered into the consent decree and asked them to join them in financing the cleanup operations. None accepted this offer, and Plaintiffs in turn filed this action against the non-settling PRP's. The current motion for summary judgment is directed against 32 of those defendants.[1]

### Discussion

■ A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987). An issue of fact is "genuine" if the record as a whole could lead a rational trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "material" if it might affect the outcome of the case under the governing law. *Id.* On a motion for summary judgement, the Court must take the evidence in a light most favorable to the non-moving party. *Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir.1992).

■ To establish a claim under § 107(a) of CERCLA, a plaintiff must prove:

1. the site in question is a "facility" as defined in § 101(9) of CERCLA;

2. a release or threatened release of a hazardous substance has occurred;

3. the release or threatened release has caused the plaintiff to incur response costs; and

4. the defendant is a responsible party under § 107(a) of CERCLA.

---

1. Originally, Plaintiffs brought this motion against 36 of the defendants. Subsequent to filing its motion, Plaintiffs have dismissed two defendants, Taracorp and Roy Weston, Inc., from the case altogether. Plaintiffs have also withdrawn their motion for summary judgment

against Pensacola Battery Service, Patricia Lampp and Roy Fuller Battery Service. Concurrently, these defendants have withdrawn crossmotions for summary judgment they filed in response to Plaintiffs' motion.

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir. 1989); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir.1989); *Chesapeake & Potomac Tel. Co. v. Peck Iron & Metal Co.,* 814 F.Supp. 1269, 1274 (E.D.Va. 1992). Here, it is uncontested Plaintiffs have established the first three elements of their § 107 claim. The Sapp Battery Site qualifies as a "facility" under CERCLA, *see* 42 U.S.C.A. § 9601(9) (West 1994), and there has been a release of a hazardous substance—principally, lead.[2] Moreover, Plaintiffs have incurred response costs in cleaning up the site and will continue to incur costs in the future.

*I. C. Brown and Mandy Sapp—"Owner and Operator" liability*

█ Before addressing the arguments of the battery-seller defendants, the Court first assesses the liability of C. Brown and Mandy Sapp. As former owners of the Site, Brown and Mandy Sapp are liable under § 107(a)(2). This subsection imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of. . . ." 42 U.S.C.A. § 9607(a)(2) (West 1994).

The Sapps have not responded to Plaintiffs' motion. The land records of Jackson County, Florida, however, unequivocally establish Brown and Mandy Sapp owned the entire property from 1970 to 1973, and at least some of the property until 1978. The deposition of former Sapp employee Otis Corbin also establishes Brown Sapp operated the battery breaking business at the time lead and battery acid were released into the environment.

On the basis of this record, there is no genuine issue of material fact as to Brown and Mandy Sapp's liability under § 107(a)(2)

of CERCLA. Accordingly, Plaintiffs' motion for summary judgment against these two defendants is GRANTED.

*II. Common Issues: "Arranger" Liability Under § 107(a)(3) of CERCLA*

The battery-seller defendants responding to Plaintiffs' motion (Defendants) have asserted several common arguments against liability under § 107 of CERCLA. With the exception of defendants C. Brown and Mandy Sapp, Plaintiffs contend Defendants are liable under § 107(a)(3) of CERCLA for cleanup costs as parties who "arranged for" the disposal of hazardous substances at the Sapp Battery Site. § 107(a)(3) imposes liability on:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C.A. § 9607(a)(3) (West 1993). Parties who qualify as "arrangers" under § 107(a)(3) may be held liable for the costs incurred by the Government and other parties in cleaning up a hazardous waste site. *Id.* at § 9607(a)(4)(A) and (B).

Defendants, however, contend Plaintiffs have not proven they "arranged for" the disposal or treatment of a hazardous substance when they sold batteries to Sapp. Though individual defendants phrase their contentions differently, in essence they advance three common arguments against finding "arranger" liability in this case. First, Defendants argue § 107(a)(3) requires Plaintiffs to prove a defendant *intended* to dispose of or treat a hazardous substance when it

---

**2.** CERCLA defines "hazardous substance" in part as "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the [Resource Conservation and Recovery Act (RCRA)] [42 U.S.C.A. § 6921]. . . ." 42 U.S.C.A. § 9601(14) (West 1994). The EPA has listed lead as a "characteristic" hazardous waste under 42 U.S.C.A. § 6921. *See* 40 C.F.R. § 261.20–.24 (1993). Likewise, spent lead-acid batteries are deemed hazardous waste under

RCRA. *See* 40 C.F.R. § 261.6(a)(2)(iv) (1993) (spent lead-acid batteries being reclaimed are subject to regulation under RCRA); *United States v. ILCO, Inc.,* 996 F.2d 1126, 1131–32 (11th Cir.1993) (holding spent lead-acid batteries are hazardous wastes regulated under RCRA). Since these substances are deemed hazardous wastes and regulated under RCRA, they are by definition "hazardous substances" under CERCLA.

sold batteries to Sapp. Since Plaintiffs have failed to produce any evidence Defendants had the intent to dispose of the batteries when they dealt with Sapp, Defendants cannot be liable under CERCLA. Second, Defendants contend they had no knowledge of Sapp's recycling process and exercised no control over the batteries once Sapp took possession of them. Without this knowledge and control, argue Defendants, they cannot be liable for Sapp's conduct. Finally, Defendants claim they cannot be held liable under § 107(a)(3) because they did not make the "crucial decision" to break open the batteries. Rather, Sapp alone decided how it would recycle the batteries. Here, Defendants rely on the "decision test" of *United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842 (S.D.Ill.1984). The Court will address each of these arguments in turn.

### A. Intent as a requirement under § 107(a)(3)

■ Defendants' principal defense is they did not intend to dispose or treat the spent batteries when they sold them to Sapp. Instead, Defendants contend they sold a "valuable commodity" with the intent of making a profit. While this statement rings true, it only absolves Defendants if § 107(a)(3) requires proof of intent. Since the Court declines to read such a requirement into this provision, Defendants' argument must fail.

On its face, the language of § 107(a)(3) does not refer to a party's intent. Rather, this provision states plainly "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person ..." may be held liable under CERCLA. 42 U.S.C.A. § 9607(a)(3). No-

where in the text of this subsection appear the words "intent," "knowingly," "willfully" or any other motivational term.

Defendants have focused their argument, however, on the meaning of the phrase "arranged for disposal or treatment." The words "disposal" and "treatment" are used in CERCLA as they are defined in the Resource Conservation and Recovery Act (RCRA). 42 U.S.C.A. § 9601(29).[3] The phrase "arranged for" on the other hand, is not defined in CERCLA. Given its plain meaning, the verb "to arrange" arguably implies a person has the intent to accomplish that which they are "arranging" to do. Indeed, several courts relying on this implication have reasoned "arranger" liability only exists when a defendant *intends* to dispose or treat a hazardous substance when they deal with it. *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir.1993), cert. denied, — U.S. —, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994); *United States v. Cello–Foil Products, Inc.*, 1994 Hazardous Waste Litig.Rep. 26287, 26289–91 (W.D.Mich. March 17, 1994); *see Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 654–56 (N.D.Ill.), aff'd, 861 F.2d 155 (7th Cir.1988). Citing these and other cases, Defendants assert § 107(a)(3) incorporates an implicit intent requirement.

■ This argument, however, ignores the "strict" nature of CERCLA liability. The Eleventh Circuit and other courts have repeatedly held § 107(a) imposes strict liability on responsible parties. *See, e.g., United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1554 (11th Cir.1990), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); *In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 897 (5th Cir.1993); *Dedham Water Co.,*

---

**3.** RCRA defines "disposal" as:
> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C.A. § 6903(3) (West 1983). The same statute defines "treatment" as:
> when used in connection with hazardous waste, means any method, technique, or pro-

cess, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.

*Id.* at § 6903(34).

889 F.2d at 1150 (1st Cir.); *United States v. Aceto Agricultural Chems. Corp.*, 872 F.2d 1373, 1377 (8th Cir.1989); *United States v. Monsanto,* 858 F.2d 160, 167 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Levin Metals Corp. v. Parr–Richmond Terminal Co.,* 799 F.2d 1312, 1316 (9th Cir.1986); *J.V. Peters & Co., Inc. v. Administrator, Environmental Protection Agency,* 767 F.2d 263, 266 (6th Cir. 1985); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2d Cir.1985). Thus, lack of knowledge or intent should not serve as a defense to liability under CERCLA. Given this precedent, the Court hesitates to conclude the phrase "arranged for" implies a plaintiff must prove a defendant's intent to dispose or treat to prevail on a claim under § 107(a)(3). *See United States v. Fleet Factors,* 821 F.Supp. 707, 724 (S.D.Ga.1993) ("Section 9607(a)(3) liability may attach even if the potentially responsible party did not intend to dispose of the hazardous substances").

In *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313 (11th Cir. 1990), the Eleventh Circuit addressed the meaning of the term "arrange" as used in § 107(a)(3). In *Florida Power & Light,* the defendants were manufactures of electrical transformers containing PCB-contaminated oil. The defendants sold transformers to an electrical company who then used them as transformers in its business. After forty years, the electrical company sold the transformers to a scrap metal dealer. While the scrap dealer possessed the transformers, they broke open causing a spill of the PCB-contaminated oil. The scrap dealer and the electrical company sued the manufacturers arguing the manufacturers had "arranged" to dispose of the oil and hence were liable under § 107(a)(3). *Florida Power & Light,* 893 F.2d at 1314–15.

The Eleventh Circuit, however, upheld summary judgment in favor of the manufacturers. In doing so, the court noted "arrange" should be given a "liberal judicial interpretation" in order to effectuate the broad remedial scheme embodied in CERC-LA. The court cautioned, however, that "[w]hether an 'arrangement for' disposal exists depends on the facts of each case." More particularly, the court reasoned:

> If a party merely sells a product, without additional evidence that the transaction includes an "arrangement" for the ultimate disposal of a hazardous substance, CERCLA liability would not be imposed.

In rejecting any *per se* rule for finding manufacturer liability under CERCLA, the court concluded:

> that even though a manufacturer does not make the critical decisions as to how, when, and by whom a hazardous substance is to be disposed, the manufacturer may be liable. For liability to be imposed on such a manufacturer, the evidence must indicate that the manufacturer is the party responsible for "otherwise arranging" for the disposal of the hazardous substance.

The court concluded the transformer manufacturers could not be held liable because they had not "arranged" in any sense to dispose or treat the PCB-contaminated oil. Rather, the manufacturers had merely sold the transformers to the electrical company who used them productively for forty years. *Id.* at 1317–19.

Both sides in the instant case elicit *Florida Power & Light* in support of their cause. While *Florida Power & Light* is instructive, it does not resolve the specific issue of whether § 107(a)(3) incorporates an intent requirement. Moreover, much of the court's reasoning in *Florida Power & Light* focused on when a manufacturer of a product containing a hazardous substance can be liable if that substance is ultimately released into the environment. In the instant case on the other hand, Defendants are not manufacturers who sold a useful product incidentally containing a hazardous substance.

Unlike Defendants, the Court does not read *Florida Power & Light* as establishing a plaintiff must prove intent to recover under § 107(a)(3). In discussing the meaning of "arrange," the court never stated the term implied an element of intent or motivation.[4]

---

**4.** The Court acknowledges that in upholding the district court's summary judgment in favor of the manufacturers, the *Florida Power & Light* court noted:

Instead, the court instructed the term "arrange" should be interpreted broadly. *Id.* at 1317. At the same time, the court cautioned the character of the exchange at issue in each case should be closely scrutinized to see whether it amounted to an "arrangement" to dispose or treat a hazardous substance. *See id.* at 1317–18.

■ The reasoning in *Florida Power & Light* suggests one factor to consider in assessing the character of a transaction is the nature of the material exchanged. In determining liability under § 107(a)(3), courts elsewhere have distinguished between the sale or exchange of a "useful" product versus a "waste" product. *See AM International v. International Forging Equipment Corp.,* 982 F.2d 989, 999 (6th Cir.1993); *Chesapeake and Potomac Tel. Co. v. Peck Iron & Metal,* 814 F.Supp. 1269 (E.D.Va.1992); *United States v. Pesses,* 794 F.Supp. 151, 156 (W.D.Pa.1992); *Prudential Insurance Co. v. United States Gypsum,* 711 F.Supp. 1244, 1254 (D.N.J.1989). When a party sells a product incidentally containing a hazardous substance but having value as being useful for the purpose for which it was manufactured, then the transaction is less likely to be an "arrangement" to dispose of a hazardous substance. *See United States Gypsum,* 711 F.Supp. at 1254. In these cases, the party receiving the product will use the product in the manner for which it was manufactured. *See id.* On the other hand, if a product has no value for the purpose for which it was manufactured and it contains a hazardous substance, then it is more likely the sale is an "arrangement" to dispose of the substance. *See id.*

■ In the case *sub justice,* the products at issue were spent lead acid batteries. Contrary to the claims of some defendants, the record does not indicate the batteries Sapp purchased from Defendants were capable of being used as batteries—i.e., they could supply electric current. Rather, the batteries only had value because of the lead they contained.[5] Instead of dealing in a "useful" product, Defendants essentially trafficked in a hazardous substance. This is precisely the type of transaction CERCLA covers.

This conclusion is bolstered by comparing the instant case to two decisions Defendants have frequently cited in their briefs. In *Edward Hines Lumber Co.,* the court reasoned defendants who sold new chemicals to the plaintiff's wood treatment facility had not "arranged" to dispose of hazardous substances. *Edward Hines Lumber Co.,* 685 F.Supp. at 656. The chemicals at issue in that case were formulated for use in the plaintiff's treatment process and were not wastes. *Id.* Similarly, the court in *United States Gypsum* concluded the defendants, designers and manufacturers of asbestos building products, had not arranged to dispose of a hazardous substance when they sold asbestos products to contractors who later incorporated them into buildings. *United States Gypsum,* 711 F.Supp. at 1254–55. Rather than "arranging" to dispose of the asbestos products, the defendants conveyed "a useful, albeit dangerous product, to serve a particular, intended purpose." *Id.* at 1255. Hence, in both cases, the courts held the defendants were not liable under § 107(a)(3). *Id.; Edward Hines Lumber,* 685 F.Supp. at 656.

In contrast, Defendants in the instant case sold products having no usefulness except as feed material for Sapp's recycling operation. As originally manufactured, the batteries were useful for providing electric current. Once the batteries could no longer function as batteries, however, they became a waste

[Plaintiffs] did not present any affidavits to support their contention that the manufacturers *intended* to otherwise dispose of hazardous waste when they sold the transformers. Nothing in the record supports an inference that the manufacturers arranged for the disposal of hazardous waste by selling the transformers. *Florida Power & Light,* 893 F.2d at 1319 (emphasis added). While the court referred here to the defendants' "intent," this Court does not conclude this single reference establishes § 107(a)(3) incorporates an intent requirement. Notably, this lone reference to "intent" comes after the court's discussion of the legal rules to be applied in the case. Moreover, it is unclear whether in making this comment the Eleventh Circuit was implicitly reasoning intent is an element of a § 107(a)(3) claim or whether the court was merely re-stating what the plaintiffs in *Florida Power & Light* contended they could prove.

5. Indeed, the price Sapp paid for the batteries was determined by the market price of lead.

product. Though the spent batteries still had residual value, this value depended on the lead within the batteries.

Moreover, for anyone to realize this value, the batteries had to be broken open and the lead groups recovered. The process of breaking open the batteries, recovering the lead groups, washing the lead, and disposing of the acid and battery casings amounted to "treatment" of a hazardous substance as defined by CERCLA. Sapp employed a "process ... designed to change the physical, chemical or biological character or composition of [a] hazardous waste [lead, spent lead acid batteries] ... so as to render such waste ... amendable for recovery." 42 U.S.C.A. § 6903(34). Furthermore, Sapp's handling of the acid and burial of the battery casings constituted a "disposal" of a hazardous substance as that term is defined in CERCLA. See 42 U.S.C.A. § 6903(3). Regardless of Defendants' motivation, when they sold spent batteries to a battery recycler like Sapp, Defendants "arranged for the disposal or treatment" of a hazardous substance.

On this issue, the Court agrees with the reasoning and holdings in *Chesapeake and Potomac Tel. Co. v. Peck Iron & Metal*, 814 F.Supp. 1269 (E.D.Va.1992) and *United States v. Pesses*, 794 F.Supp. 151 (W.D.Pa. 1992). In cases factually on point with the case at bar, the courts in *Chesapeake* and *Pesses* reasoned defendants who sold spent batteries to battery recyclers had "arranged for" the treatment and disposal of a hazardous substance. *Chesapeake*, 814 F.Supp. at 1275; *Pesses*, 794 F.Supp. at 155–58. *See also State of California v. Summer Del Caribe, Inc.*, 821 F.Supp. 574 (N.D.Cal.1993) (reasoning a defendant who sold solder dross to a metal recycler had arranged for the disposal of a hazardous substance despite the fact the solder dross had recycling value).

In their briefs, Defendants argue against relying on *Chesapeake* and *Pesses* while urging the Court to adopt the reasoning and holding in *Catellus Development Corp. v. United States*, 828 F.Supp. 764 (N.D.Cal. 1993). In *Catellus*, the court refused to impose liability under § 107(a)(3) on a company who sold spent batteries to a recycler. *Catellus*, 828 F.Supp. at 773. The Court, however, declines to follow the reasoning in *Catellus*.

While *Catellus* is factually similar to the instant case, there is one important distinction. In *Catellus*, the defendant sold its batteries to a third-party recycler who broke the batteries on its own property and later dumped the casings on the plaintiff's property. *Catellus*, 828 F.Supp. at 766. Consequently, there was no direct link between the defendant and the property ultimately comprising the CERCLA site. *Id.* In the instant case, however, most of the defendants sold their batteries directly to Sapp who broke the batteries on its own property near Cottondale, Florida. As was the case in *Chesapeake* and *Pesses*, Defendants had a direct link to the CERCLA site. The *Catellus* court stressed this factual difference in distinguishing that case from *Chesapeake* and *Pesses*. *See id.* at 770–71.

Yet, this factual distinction was not the only reason the *Catellus* court declined to follow *Chesapeake* and *Pesses*. Relying in part on Ninth Circuit precedent, the *Catellus* court rejected the "useful product" analysis outlined above and employed in *Chesapeake* and *Pesses*. Instead, the court in *Catellus* focused on whether the batteries at issue had a "productive use." *Id.* at 768. The court reasoned that because the batteries had value on a viable market and could be recycled into a number of beneficial lead products, the batteries had a "productive use." Hence, the court concluded the batteries were not "products which, by their very nature, would subject their seller to CERCLA liability under [§ 107(a)(3) ]." *Id.* at 769.

Unlike the court in *Catellus*, this Court finds the "useful product" analysis employed by the courts in *United States Gypsum*, *Chesapeake* and *Pesses* to be helpful in assessing the character of transaction under § 107(a)(3). Moreover, the Court does not discern any precedent in this circuit—as is apparently the case in the Ninth Circuit—against this mode of analysis.[6] For this rea-

---

6. Plaintiffs, in footnote 4 of their response to Defendants' cross-motions (doc. 383), claim the

"useful product" argument is not "available" in the Eleventh Circuit given that court's reasoning

son, the Court finds *Chesapeake* and *Pesses* represent the better-reasoned view on this issue and therefore respectfully declines to follow *Catellus.*

### B. Knowledge under § 107(a)(3)

■ As a second argument against liability under § 107(a)(3), several defendants contend they had no knowledge of where or how Sapp was treating the batteries they sold to the company. Without this knowledge according to Defendants, they cannot be said to have "arranged for" the disposal or treatment of the batteries. This defense, however, fails for the same reason as the contention § 107(a)(3) incorporates an intent requirement: CERCLA is a strict liability statute and thus knowledge cannot be an element of a claim under § 107(a).

Courts elsewhere have rejected the argument a defendant must have known where or how a hazardous substance was to be disposed of or treated for liability to attach under § 107(a)(3). *United States v. Mottolo,* 695 F.Supp. 615, 626 (D.N.H.1988); *O'Neil v. Picillo,* 682 F.Supp. 706, 719 n. 2 (D.R.I. 1988), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Ward,* 618 F.Supp. 884, 895 (D.C.N.C.1985); *see Fleet Factors,* 821 F.Supp. at 724; *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 233–34 (W.D.Mo.1985). Reading a knowledge requirement into § 107(a)(3) would encourage generators to escape liability by "playing dumb" about how their hazardous wastes are disposed of. *Ward,* 618 F.Supp. at 895. This in turn would undermine CERCLA's goal of placing responsibility for the proper treatment and disposal of hazardous substances on those who generate these dangerous compounds and arrange for their disposal or treatment. In short, Defendants cannot eschew their responsibilities under CERCLA merely because they allegedly

did not know the location or methods of Sapp's business.

### C. The "Decision Test" of A & F Materials

■ In addition to arguing lack of intent or knowledge, several defendants contend they are not liable under § 107(a)(3) because they did make the "crucial decisions" regarding when and how the batteries would be recycled. Defendants cite *United States v. A & F Materials Co., Inc.,* 582 F.Supp. 842 (S.D.Ill.1984) in support of this defense. While the Court agrees the "decision test" of *A & F Materials* is relevant to the analysis under § 107(a)(3), the Court concludes the test affords no protection to most of the battery sellers in this case.

■ At one point in *A & F Materials,* the court characterized the inquiry under § 107(a)(3) as:

who decided to place the waste into the hands of a particular facility that contains hazardous wastes.

*Id.* at 845. Later, in distinguishing another case, the *A & F Materials* court concluded:

Thus, liability for releases under § 107(a)(3) is not endless; it ends with that party who both owned the hazardous waste and made the crucial decision how it would be disposed of or treated, and by whom.

*Id.* Citing this "decision test," Defendants contend it was Sapp—not Defendants—who made the "crucial decisions" to transport the batteries back to the Site and break the batteries open. Defendants note that after they sold the batteries to Sapp, they retained no interest or control over the batteries. Hence, they could not make any of the decisions regarding the disposal of the batteries. Consequently, under the reasoning of *A & F Materials,* Defendants claim they did not "arrange for" the disposal of hazardous substances.[7]

in *Florida Power & Light.* As explained above, however, the Court does not find the "useful product" argument inconsistent with *Florida Power & Light* or other circuit precedent.

**7.** Initially, Plaintiffs counter this argument by claiming the Eleventh Circuit, in *Florida Power & Light,* "expressly rejected" the test articulated in

*A & F Materials.* Pl.'s Resp.Mem. in Opp'n to Defs.' Cross-Mots. for Summ.J., at 16–17. As a result, Plaintiffs contend Defendants' lack of control over the transport and treatment of the batteries after the sale is irrelevant.

The Court does not agree with Plaintiffs that the Eleventh Circuit "expressly rejected" the rea-

The Court, however, finds this argument unavailing. While Defendants may not have had a role in transporting or recycling the batteries, Defendants made the "crucial decision" to sell the batteries to Sapp in the first place. With certain exceptions [8], Defendants decided to sell batteries to Sapp and therefore placed the hazardous substances into Sapp's hands for disposal and treatment. In selling the batteries to Sapp—a company in the business of breaking batteries—Defendants made a "crucial decision" as to how, when and by whom the hazardous substances would be treated and disposed. Thus, the reasoning of *A & F Materials* supports imposing liability on many of the defendants in this case.

### D. Conclusion regarding "arranger" liability under § 107(a)(3)

In the end, the Court rejects the arguments asserted by most of the defendants that they did not "arrange for" the disposal and treatment of hazardous waste when they sold batteries to Sapp. § 107(a)(3) does not require Plaintiffs to prove Defendants acted with any specific intent or knowledge when they did business with Sapp. Furthermore, the fact that most defendants decided to sell batteries to Sapp means they exercised discretion in how, when and where the batteries were to be treated and disposed of. Under these circumstances, the Court finds, with

certain exceptions noted below, Defendants liable under § 107(a)(3) of CERCLA.[9]

Accordingly, the Court DENIES the cross-motions for summary judgment of those defendants whose only defense is they did not "arrange for" the disposal and treatment of a hazardous substance.

### III. Particular Defenses raised by Individual Defendants

Several defendants, in addition to arguing they cannot be held liable as "arrangers" under § 107(a)(3), raise defenses particular to their own circumstances. Having dispatched of the common defenses raised by all defendants, the Court now turns to these individual defenses.

### A. Defendant Mambourg and the "Indirect Seller" Scenario

Defendant William Mambourg, f/d/b/a West Coast Batteries, has filed a cross-motion for summary judgment contending that as an "indirect seller," he cannot be held liable under § 107(a)(3). As explained below, the Court DENIES Mambourg's cross-motion as well as Plaintiffs' motion for summary judgment against Mambourg.

From 1966 until 1988, Mambourg operated West Coast Batteries in Ft. Myers, Florida. On several occasions in 1979, Mambourg sold spent batteries to Blattner Metals of Jack-

---

soning of *A & F Materials* in *Florida Power & Light.* In its opinion, the court in *Florida Power & Light* quoted the reasoning of *A & F Materials,* but declined to apply this as a "per se" rule of determining manufacturer liability under § 107(a)(3). *Florida Power & Light,* 893 F.2d at 1317–18. Rather than rejecting for all purposes the "decision test" of *A & F Materials,* the Eleventh Circuit stated that with regards to manufacturers, liability may be imposed in situations where a manufacturer does *not* make the "crucial decisions" regarding when, where and how a hazardous waste is disposed of. *Id.* at 1318. The Eleventh Circuit neither expressly disagreed with *A & F Materials* nor implied that case was mistaken in its analysis.

As noted earlier, the thrust of the Eleventh Circuit's reasoning in *Florida Power & Light* is courts should assess the character of a transaction to determine whether a defendant "is the party responsible for 'otherwise arranging' for the disposal of the hazardous substance." *Id.* In determining the character of Defendants' sales

of spent batteries to Sapp, the "decision test" of *A & F Materials* is relevant and beneficial to the Court. The Court does not, however, rely on this test as a "per se" determinant of liability in this case. Such use of *A & F Materials* would be improper under *Florida Power & Light.* Instead, the Court considers it appropriate to treat the "decision test" as one *factor* for the Court to consider in deciding whether Defendants are liable under § 107(a)(3). In this regard, the "decision test" stands on the same footing as the "useful product" analysis discussed earlier.

8. Certain defendants—e.g., Mambourg—apparently sold batteries to Sapp through "battery brokers" like Blattner Metals. The liability of these "indirect sellers" will be addressed separately.

9. Since the Court finds Plaintiffs had a reasonable basis for bringing this suit, the Court also GRANTS Plaintiffs' motion to strike Defendant American Iron & Metal Co.'s counterclaim based on Rule 11 (doc. 258 at 26 n. 13).

sonville, Florida. Blattner in turn brokered these batteries to Sapp. When Mambourg arranged the sales, he dealt exclusively with Blattner. Blattner paid Mambourg for the batteries, and Sapp later paid Blattner once it had brokered the load to Sapp. Sapp, however, picked up the batteries directly from West Coast Batteries. Although Mambourg disclaims any knowledge Sapp was involved in the transaction, it is undisputed Sapp picked up the batteries in trucks marked with the company's name.

■ Mambourg as well as several other defendants in this action can be characterized as "indirect sellers" because they sold batteries to Sapp through battery brokers. Unlike the other defendants, these defendants did *not* make the decision to sell batteries to Sapp. Instead, the battery broker chose who would recycle the batteries. Under the reasoning of *A & F Materials*, it would appear these indirect sellers should not be held liable under § 107(a)(3). Indeed, liability under CERCLA is not boundless. If a party does not exercise some control over the location and method of disposal, then it should not be held liable under CERCLA. Without such discretion, a party cannot insure hazardous substances are responsibly treated and disposed of. Under these circumstances, imposing liability would not only be unfair, it would not further CERCLA's worthy goals.

At the same time, parties cannot escape liability under CERCLA merely because they pawned their hazardous substances off on a broker or middleman. As noted earlier, persons who generate hazardous substances or arrange for their disposal should not be allowed to shirk their duties under CERCLA by operating blindfolded. Thus, the Court concludes defendants who sold batteries to Sapp through a battery broker cannot avoid liability merely because it was the middleman who decided to sell the batteries to Sapp.

Instead, if the defendant had actual or constructive knowledge that Sapp would be the ultimate recipient of its batteries and still sold the batteries to the broker, then the defendant can be found liable under § 107(a)(3). *Chesapeake and Potomac Tel. Co. v. Peck Iron & Metal*, 814 F.Supp. 1293,

1300–01 (E.D.Va.1993). When the defendant knows the ultimate destination of a hazardous substance and still transfers the substance to a middleman, the defendant has essentially "arranged for" the substance to be disposed of or treated by the party who the defendant knows will eventually receive it. *See id.* Under these circumstances, it is reasonable to hold the defendant liable under CERCLA even though the transaction involves a middleman.

■ Here, the Court concludes there is a genuine issue of material fact precluding summary judgment on the issue of Mambourg's liability under § 107(a)(3). In his affidavit, Mambourg claims neither he nor his employees knew Sapp Battery was involved in its sales of batteries to Blattner. Yet, the record indicates Sapp drivers and trucks visited West Coast Batteries to pick up the batteries Mambourg sold to Blattner. Given this conflicting evidence, there is a genuine issue as to whether Mambourg knew the batteries it sold to Blattner would end up with Sapp. Consequently, summary judgment for both parties must be DENIED.

### B. Defendant Charles Cleveland's Motion to Dismiss for Lack of Personal Jurisdiction

Defendant Charles Cleveland, f/d/b/a Carolina Waste & Salvage, moves the Court to dismiss Plaintiffs' claim against him for lack of personal jurisdiction. Cleveland contends the Court cannot exercise jurisdiction over him under Florida's long-arm statute. Furthermore, Cleveland argues he does not have sufficient "minimum contacts" with the state of Florida to satisfy the dictates of Due Process. The Court, however, finds it has personal jurisdiction over Cleveland in this matter and therefore the motion is DENIED.

In the late 1970s, Cleveland operated Carolina Waste & Salvage as a sole proprietorship. Cleveland currently is a shareholder of Carolina Scrap Processing, Inc.—a successor corporation to Carolina Waste & Salvage (both entities will hereinafter be referred to as "Carolina Scrap"). Cleveland is a resident of South Carolina, and Carolina Scrap has

always been located in Anderson, South Carolina.

Carolina Scrap sold spent batteries to Sapp Battery on at least five occasions in 1978. In making these purchases, Sapp followed its standard procedure: Sapp contacted Carolina Scrap inquiring whether it had batteries to sell; and if it did, Sapp sent one of its trucks to Anderson, South Carolina to pick up the batteries. Sapp paid for the batteries by check after they were loaded on to its truck at Carolina Scrap. After Sapp picked up the batteries, Carolina Scrap retained no interest or control over the batteries. Cleveland further claims that at the time, Carolina Scrap did not know where Sapp took the batteries or that Sapp later broke the batteries to recover the lead. Cleveland states he believed Sapp intended to refurbish the batteries so they could once again function as batteries.

Aside from its dealings with Sapp, Carolina Scrap appears to have no other contacts with the state of Florida. It is uncontested Carolina Scrap owns no property or bank accounts in Florida. Carolina Scrap is not licensed to do business in Florida, and maintains no offices here. Furthermore, the record does not reveal Carolina Scrap has advertised in Florida or generated any revenue from the state. In sum, Cleveland contends that based on this paucity of contacts with Florida, he and Carolina Scrap cannot be subject to personal jurisdiction in a Florida court.

Because the Court has not conducted a discretionary evidentiary hearing on Cleveland's motion, Plaintiffs must establish a prima facie case of personal jurisdiction over Cleveland—a non-resident defendant. *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990); *Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 855 (11th Cir.1990). A plaintiff establishes a prima facie case by presenting enough evidence to withstand a motion for directed verdict. *Madara,* 916 F.2d at 1514. The Court must accept the facts alleged in the complaint as true to the extent they are uncontroverted by the defendant's affidavits. *Id.* Where the plaintiff's complaint conflicts with the defendant's affidavits, the Court

must construe all reasonable inferences in favor of the plaintiff. *Id.*

Determining whether the Court may exercise personal jurisdiction over Cleveland requires a two-step analysis. First, the Court must ascertain whether Florida's long-arm statute authorizes the Court to exercise jurisdiction. *Id.; Sun Bank, N.A. v. E.F. Hutton & Co., Inc.,* 926 F.2d 1030, 1033 (11th Cir.1991). Assuming jurisdiction exists under Florida's statute, the Court must then determine whether or not sufficient "minimum contacts" exist to satisfy the Due Process clause of the Fourteenth Amendment. *Cable/Home Communication,* 902 F.2d at 855; *Alexander Proudfoot Co. World Headquarters, L.P. v. Thayer,* 877 F.2d 912, 919 (11th Cir.1989). Only if both steps in this analysis are satisfied may the Court exercise jurisdiction over Cleveland. *Madara,* 916 F.2d at 1514.

Plaintiffs assert two provisions of Florida's long-arm statute permit the Court to exercise jurisdiction in this case. Initially, Plaintiffs contend Carolina Scrap has committed a "tortious act" within Florida and therefore jurisdiction is proper under Fla.Stat. ch. 48.-193(1)(b). At the same time, Plaintiffs argue the Court may exercise jurisdiction under Fla.Stat. ch. 48.193(1)(f)(2). Under this provision, a defendant submits itself to the jurisdiction of Florida courts if it:

> (f) Caus[es] injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury . . .
>
> (2) Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Fla.Stat. 48.193(1)(f)(2) (1993). Cleveland counters Carolina Scrap is not subject to jurisdiction under any provision of Florida's long-arm statute.

The Court agrees with Cleveland that § (f)(2) does not confer jurisdiction in this case. Although the batteries Carolina Scrap sold to Sapp ultimately "injured" property in Florida, there is no indication Car-

olina Scrap "processed," "serviced" or "manufactured" the batteries in any fashion. Carolina Scrap did not manufacture the batteries it sold or alter them physically prior to sale. Instead, the record indicates Carolina Scrap collected spent batteries to broker to recyclers like Sapp. The Court does not read § (f)(2) as extending jurisdiction to cases like this were the defendant merely possesses a product before sending it to Florida.

On this issue, the Court finds the decision in *Murante v. Pedro Land, Inc.*, 761 F.Supp. 786 (S.D.Fla.1991) to be inapposite. In *Murante,* the court held the defendant, who sold an allegedly defective firework to the plaintiff in South Carolina, was subject to jurisdiction under § (f)(2) when that firework later injured the plaintiff in Florida. *Murante,* 761 F.Supp. at 789. In that case though, the defendant "processe[d], inspect[ed], package[d], test[ed], and distribute[d] explosive projectile fireworks." *Id.* at 787.[10] Here, Carolina Scrap did not physically alter the batteries it sold. For this reason, the Court does not consider *Murante* to be persuasive.

■ The Court, however, finds Cleveland and Carolina Scrap committed a "tortious act" in Florida thereby triggering jurisdiction under Fla.Stat. ch. 48.193(1)(b). Though the Court has not uncovered any Eleventh Circuit or Florida case defining a CERCLA violation as a "tortious act," the Court has little difficulty reaching this conclusion. As discussed above, the Court rejects Carolina Scrap's argument that it did not "arrange for" treatment and disposal of lead as described in § 107(a)(3) of CERCLA. By selling batteries to Sapp Battery, Carolina Scrap helped create the serious environmental hazard that is now the "Sapp Battery Site" near Cottondale, Florida. Under similar circumstances, another court in an action brought under § 107(a)(3) reasoned:

It seems clear that the release of a hazardous substance creating an imminent danger to public health and welfare and to property and the environment is in the nature of a "tort."

*United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 245 (D.C.Mo.1985) (inter-

preting Missouri's long-arm statute and discussing Missouri tort law); *see also United States v. Consolidated Rail Corp.,* 674 F.Supp. 138, 143 (D.Del.1987) (finding jurisdiction under a similar "tortious act" provision of Delaware's long-arm statute in a CERCLA case). The instant case is also analogous to cases where courts have found violations of other federal statutes to be "tortious" acts under Florida's long-arm statute. *See Cable/Home Communication,* 902 F.2d at 856–57 (finding violations of federal copyright and communications laws to be sufficient to trigger jurisdiction under Fla.Stat. ch. 48.193(1)(b)); *Williams Electric Co., Inc. v. Honeywell, Inc.,* 854 F.2d 389, 394 (11th Cir.1988) (federal anti-trust laws).

■ Having found Florida's long-arm statute confers jurisdiction over Cleveland, the Court next ascertains whether the exercise of jurisdiction comports with the Due Process clause of the Fourteenth Amendment. This determination in turn necessitates two inquiries. First, to establish personal jurisdiction, the defendant must have sufficient "minimum contacts" with the forum state. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1545 (11th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993); *Cable/Home Communication,* 902 F.2d at 855. Second, the exercise of jurisdiction must not offend " 'traditional notions of fair play and substantial justice.' " *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528, 543 (1985); *Vermeulen,* 985 F.2d at 1545.

■ In assessing a defendant's "minimum contacts" with the forum state, courts have distinguished between contacts establishing "specific" and "general" jurisdiction. *Burger King,* 471 U.S. at 473, n. 15, 105 S.Ct. at 2182–83, n. 15; *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, nn. 8 & 9, 104 S.Ct. 1868, 1872, nn. 8 & 9, 80 L.Ed.2d 404 (1984); *Madara,* 916 F.2d at

---

**10.** The defendant did not, however, manufacture fireworks. *Murante,* 761 F.Supp. at 787.

1516, n. 7. Jurisdiction over a nonresident defendant in a suit arising out of or related to the defendant's contacts with the forum state is "specific" jurisdiction. *Helicopteros,* 466 U.S. at 414, n. 8, 104 S.Ct. at 1872, n. 8; *Madara,* 916 F.2d at 1516, n. 7. "General" jurisdiction on the other hand, is founded upon a defendant's contacts with the forum that are unrelated the cause of action. *Helicopteros,* 466 U.S. at 414, n. 9, 104 S.Ct. at 1872, n. 9; *Madara,* 916 F.2d at 1516, n. 7. Since Plaintiffs do not claim Carolina Scrap's contacts with Florida are sufficient to establish general jurisdiction, the Court turns instead to the elements of specific jurisdiction.

■■■ In assessing Cleveland's contacts with Florida, the Court "properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)). The Eleventh Circuit in *Vermeulen* succinctly stated the Court's inquiry on this issue:

> To constitute constitutionally minimum contacts, the defendant's contacts with the applicable forum must satisfy three criteria. First, the contacts must be related to the plaintiff's cause of action or have given rise to it. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2181; *Madara,* 916 F.2d at 1516. Second, the contacts must involve "some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ...", thus invoking the benefits and protections of its laws." [*Hanson v. Denckla,* 357 U.S. 235,

253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) ]; *see also Burger King,* 471 U.S. at 474–75, 105 S.Ct. at 2183–84. Third, the defendant's contacts with the forum must be "such that [the defendant] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

*Vermeulen,* 985 F.2d at 1546.

Here, Carolina Scrap's contacts with Florida are related to Plaintiffs' cause of action. On at least five occasions in 1978, Carolina Scrap sold spent batteries to Sapp. Sapp transported these batteries back to Florida where it broke them open at its Cottondale, Florida site. In the process, Sapp released lead and acid from these batteries into the environment thereby contributing to the toxic contamination that exists today. Under CERCLA and the consent decree entered into with the government, Plaintiffs are obligated to conduct and finance the cleanup of the Site. Though Carolina Scrap did not supply all or even most of the batteries Sapp recycled, Carolina Scrap certainly contributed to the contamination and hence the cost of cleanup.

Similarly, the Court concludes Carolina Scrap "purposely availed" itself of the privilege of doing business in Florida. Carolina Scrap decided to sell batteries to Sapp so the batteries could be broken at Sapp's Florida facility. Though Cleveland contends Carolina Scrap did not know the destination or ultimate fate of the batteries, the record indicates otherwise.[11] When Carolina Scrap

---

11. In his affidavit supporting Cleveland's cross-motion for summary judgment, Kenneth Harbert denies Carolina Scrap had any knowledge of Sapp's locale or battery breaking business. Harbert goes on to say he believed the batteries they sold to Sapp were to be "reconditioned" to function as batteries.

These claims, however, conflict with the fact Sapp's address was clearly printed on the checks Carolina Scrap received for the batteries. On at least one receipt, Carolina Scrap even wrote Sapp's address as "Cottondale, Florida." Furthermore, when Sapp picked up batteries from Carolina Scrap, its trucks bore the name of Sapp Battery and its truckers identified themselves as Sapp Battery employees.

As to whether the batteries could be "reconditioned," Harbert's claim conflicts with the fact

that on almost all of its sales receipts, Carolina Scrap listed the batteries as "junk batteries." This classification does not indicate the batteries could be reconditioned or that Carolina Scrap thought they would be refurbished.

Meanwhile, Sapp paid Carolina Scrap a certain price per pound for the batteries it purchased. This price was determined by the price of lead on the secondary metals market. Thus, the Court infers it was the value of the lead within the batteries—not the value of the batteries as they could be "reconditioned"—that motivated Carolina Scrap to sell, and Sapp Battery to buy, the spent batteries. The Court concludes that under these circumstances, sellers of spent batteries like Carolina Scrap had to anticipate that at some point the batteries would be "bro-

sold batteries to Sapp, it placed a hazardous substance into the hands of a company for transport to Florida. These batteries only had value because Sapp recycled them in Cottondale, Florida to recover the lead within. If it were not for this recovery process, Sapp would never have purchased batteries from Carolina Scrap. In this manner, Carolina Scrap benefitted from Sapp's Florida business.

Finally, the Court, with some hesitation, concludes Carolina Scrap could have "reasonably anticipated" being haled into a Florida court when it sold batteries to Sapp. Admittedly, the sales at issue occurred in 1978—two years before CERCLA was enacted. At the time, Carolina Scrap could not have known the recycling of batteries and the concomitant release of hazardous substances into the environment would trigger liability under CERCLA and subsequently-enacted state laws.

Yet, when Carolina Scrap sold batteries to Sapp, RCRA—governing the handling, disposal and treatment of hazardous wastes—was in effect. While this action does not involve a claim under RCRA, Carolina Scrap should have been aware of its obligations under federal law to properly handle and dispose of a hazardous waste. In this respect, Carolina Scrap should have been aware that its dealings with Sapp could result in litigation. Moreover, by dealing with a Florida company, it was foreseeable that any litigation regarding liability under environmental laws or otherwise could occur in Florida.

As the discussion above indicates, whether or not Cleveland and Carolina Scrap have sufficient "minimum contacts" with Florida is a close question. Still, the Court concludes Cleveland had the necessary "minimum contacts" with this forum to justify exercising personal jurisdiction over him in this matter. *See Waste Management of Wisconsin, Inc. v. Uniroyal, Inc.,* 1992 WL 227379, *6 (W.D.Wis.1992) (reasoning non-resident defendants who had generated wastes since 1955 and deposited them in a hazardous waste site in the forum state had sufficient minimum contacts with the forum and could reasonably anticipate being haled into court); *Conservation Chemical Co.,* 619 F.Supp. at 249 (concluding that "under CERCLA, a generator-defendant can reasonably anticipate being haled into court in any state in which hazardous substances, for which such generator-defendant has arranged for disposal or treatment or arranged with a transporter for disposal or treatment, are found at a facility containing such hazardous substances and at which there is a release of hazardous substances").

■ This does not, however, end the Due Process inquiry. The Court must also assess whether exercising personal jurisdiction over Cleveland comports with "traditional notions of fair play and substantial justice." *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184; *Madara,* 916 F.2d at 1519. In exceptional cases, these considerations may establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be necessary. *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184–85; *Madara,* 916 F.2d at 1519.

■ The instant case is one of those "exceptional" cases where jurisdiction is proper despite the defendant's somewhat attenuated contacts with the state of Florida. In determining whether "traditional notions of fair play and substantial justice" support jurisdiction, courts look to the several factors including the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184–85.

■ Compared to Plaintiffs' interest in obtaining effective relief, Cleveland's burden of defending this suit in Florida is not significant. The distance between South Carolina

ken" to recover the lead inside. Thus, the Court infers Carolina Scrap sold the batteries with the

knowledge they would be recycled.

and the Northern District of Florida is not great. Thus far, neither Cleveland nor his attorneys have had to travel to Florida to appear in court for hearings in this case. Even if this case should go to trial, Cleveland has not indicated he will have to transport numerous witnesses or other evidence from South Carolina. Moreover, in this era of advanced communications technology, the burden of litigating in distant courts has diminished significantly.

Plaintiffs, however, would face a significant burden if they had to sue non-Florida defendants in their home states. In addition to numerous Florida defendants, this action involves defendants from Mississippi, Alabama, Georgia, Tennessee and South Carolina. Litigating separate claims in six different states would impose a prohibitive burden upon Plaintiffs and deny them fair compensation for the costs they have incurred in cleaning up the Site. Without doubt, Plaintiffs have a strong interest in obtaining full relief in one forum.

Similarly, the interstate judicial system's interest in the efficient resolution of controversies supports litigating this action in one forum. Not only does this case involve defendants in six states, these states sit in four different federal circuits—the Fourth, Fifth, Sixth and Eleventh. If Plaintiffs are forced to pursue each defendant in its home jurisdiction, they would become enmeshed in the courts and law of four different circuits. Requiring Plaintiffs to litigate their claims in this fashion would amount to a piece-meal resolution of the controversy and enhance the risk of inconsistent judgments. In particular, multiple pronouncements on liability and damages could greatly complicate Plaintiffs' recovery and the resolution of any contribution actions among defendants. In short, efficiency dictates the resolution of Plaintiffs' claims in one action in a single forum.

Moreover, Florida has the greatest interest of any state in adjudicating this dispute. The Sapp Battery Site is located in the Florida Panhandle, and pollution from the Site has damaged Florida property. In the future, Florida residents will have to live with the long-term effects of the contamination at the Site. Like any other state, the Florida have a compelling sovereign interest in protecting the health and welfare of its citizens.

Finally, exercising jurisdiction over defendants like Cleveland would further the social policies embodied in CERCLA. When Congress passed CERCLA in 1980, it intended the statute to provide state and federal governments with a powerful tool to force the cleanup of hundreds of toxic waste dumps throughout the country. *See* H.R.Rep. No. 96–1016, Part I, 96th Cong., 2d Sess., 21, *reprinted in* 1980 U.S.C.C.A.N. 6119, 6123. Today, as in 1980, sites such as the Sapp Battery property pose significant health hazards to neighboring families and businesses. To facilitate the efficient cleanup of these sites, Congress imposed broad liability in § 107(a)(3) on parties who generate or dispose of hazardous substances. By doing so, Congress also wanted to insure those parties who were responsible for creating and disposing of toxic substances bore their share of the costs of remedying the problem. *Id.* at 6119–6120; *United States v. Price,* 577 F.Supp. 1103, 1114 (D.N.J.1983).

Cases arising out of sites on the NPL, like the Sapp Battery property, almost inevitably involve generators or arrangers from several states. Today, the treatment and disposal of hazardous substances is truly a national industry frequently involving waste brokers and middleman. As a result, hazardous substances are shipped across state lines on a regular basis. To permit defendants like Cleveland to interpose jurisdictional defenses to liability would frustrate the remedial goals of CERCLA. Hence, the shared interests of the states of this nation support exercising jurisdiction over Cleveland in this case. *See Violet v. Picillo,* 613 F.Supp. 1563, 1569–79 (D.R.I.1985) (discussing at length CERCLA's remedial scheme and holding a non-resident generator subject to personal jurisdiction under the law of "minimum contacts" as well as "other" Due Process factors); *O'Neil v. Picillo,* 682 F.Supp. 706, 716–18 (D.R.I.1988) (same case); *Allied Towing Corp. v. Great Eastern Petroleum Corp.,* 642 F.Supp. 1339, 1353–57 (E.D.Va.1986).

In sum, the Court concludes it has personal jurisdiction over Cleveland in this case.

Cleveland and Carolina Scrap have established sufficient "minimum contacts" with Florida and the "other factors" cited by the Supreme Court in *Burger King* and *World–Wide Volkswagen* strongly support a Florida forum. Given the remedial goals and scheme embodied in CERCLA, as well as the strong interests of Florida and Plaintiffs in resolving this case in a Florida court, the Court finds it is both fair and just to exercise jurisdiction over Cleveland. Accordingly, Cleveland's motion to dismiss is DENIED.

### C. Defendant N. Goldberg Co.'s Status as a "Dead and Buried" Corporation

Defendant N. Goldberg Co. (Goldberg) argues it is not amenable to suit under CERCLA because it has dissolved and distributed its assets. Citing a rule developed as part of the federal common law of CERCLA, Goldberg claims it is a "dead and buried" corporation. Relying on this rule[12], Goldberg has filed a cross-motion for summary judgment against Plaintiffs. Plaintiffs counter the "dead and buried" rule does not apply in this case and urge the Court to find Goldberg amenable to suit. For reasons explained below, the Court DENIES both Plaintiffs' and Goldberg's motions for summary judgment.

On several occasions between 1978 and 1980, Goldberg sold spent batteries to Sapp Battery from its business in South Carolina. At the time, Goldberg was incorporated under the laws of South Carolina. In late 1988, the shareholders of Goldberg voted to dissolve the corporation. According to the affidavit of Nathan Addleston, president of Goldberg at the time of its dissolution, the company's assets were distributed to the shareholders in December 1988. Articles of

dissolution were filed with the South Carolina Secretary of State on February 6, 1989. Plaintiffs filed the instant action seeking recovery against Goldberg on March 9, 1993. Goldberg contends that because it has dissolved and distributed its assets, it is no longer amenable to suit under CERCLA.

CERCLA imposes liability on "any person" who arranges for the treatment or disposal of hazardous substances. 42 U.S.C.A. § 107(a)(3). As defined in CERCLA, "person" includes corporations, but the statute does not further define the potential liability of a "corporation." *See id.* at § 9601(21). Under Rule 17(b) of the Federal Rules of Civil Procedure, "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." Fed. R.Civ.P. 17(b). As noted above, Goldberg was incorporated under the laws of South Carolina.

South Carolina's corporate law, like that of many states, includes a statute of repose permitting suits against a dissolved corporation for up to five years after the corporation has been formally dissolved. S.C.Code Ann. § 33–14–107 (Law Co-op. 1993).[13] Citing this statute, Plaintiffs claim Goldberg is amenable to suit because Plaintiffs filed the instant action within five years of when Goldberg contends it dissolved. Goldberg counters South Carolina's statute is preempted by CERCLA and therefore does not apply to this case. Instead, Goldberg claims the Court should apply the federal common law "dead and buried" rule. To this extent, the Court agrees with Goldberg.

The Supreme Court has noted that under the Supremacy Clause of the United

---

**12.** Like other defendants, Goldberg contends it cannot be held liable under § 107(a)(3) because it did not "arrange for" the disposal or treatment of spent batteries. As explained earlier, the Court concludes defendants who sold batteries to Sapp are liable under § 107(a)(3) and therefore rejects this a basis for summary judgment in Goldberg's favor.

**13.** The parties debate the version of South Carolina's repose statute applicable in this case. Plaintiffs contend the current version—last amended in 1988—applies here. Under this version, suits against dissolved corporations may be

brought until five years after dissolution. Goldberg claims the 1980 version of the statute, with its two-year limitations period, applies to this case.

For reasons that will become obvious, the Court finds it unnecessary to resolve the question of which version of South Carolina's repose statute applies. Without so holding, however, the Court notes the 1988 amendment extending the period to five years became effective January 1, 1989. Since Goldberg dissolved, if at all, no earlier than February 6, 1989, it would appear the five-year period applies in this case.

States Constitution, a state law can be preempted by a federal law in three ways. *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). First, when Congress in express terms states a federal law supersedes relevant state law, the state law is preempted. *Id.* (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Second, federal law can implicitly preempt state laws where "the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Finally, even when a federal law does not entirely occupy an area of law, state law is preempted to the extent it actually conflicts with federal law. *Id.* "Conflict" preemption can arise when compliance with both federal and state law is a "'physical impossibility.'" *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963)). Conflict preemption also results when "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

By its own terms, CERCLA does not expressly or impliedly preempt state corporate law. *See* 42 U.S.C.A. § 9613(a) (West 1983). Hence, the parties debate whether South Carolina's statute of repose is preempted because it "conflicts" with CERCLA's liability provisions. Because South Carolina's statute serves to cut off a corporation's liability on any claim five years after dissolution, Goldberg contends the state law limits a party's ability to recover damages under CERCLA. In this fashion, South Carolina's law conflicts with CERCLA and is therefore preempted. Plaintiffs on the other hand, note that under the circumstances of this case, South Carolina's law permits Plaintiffs to recover against Goldberg even though it is allegedly dissolved. Rather than standing as an obstacle to CERCLA, the South Carolina statute furthers the purposes of CERCLA. Thus, according to Plaintiffs, the state law does not conflict with CERCLA and is not preempted.

In essence, the parties dispute whether CERCLA preempts state repose statutes *in general*, or only when CERCLA and the state law conflict *under the circumstances of the given case*. On this issue, the Court agrees with Goldberg that CERCLA preempts state statutes of repose regardless of the facts of a case.[14] On their face, statutes of repose serve to limit the time within which a plaintiff under CERCLA can recover the costs of cleaning up sites contaminated with hazardous substances. By restricting the reach of CERCLA liability, these state statutes "stand as obstacle to" the liability provisions of CERCLA and hinder the achievement of the statute's goals. The Court therefore concludes CERCLA preempts South Carolina's statute of repose to the extent it limits recovery against dissolved corporations under CERCLA.

**14.** The Court notes at least one district court has adopted Plaintiffs' approach to the preemption issue. *See United States v. SCA Services of Indiana, Inc.*, 837 F.Supp. 946, 952 (N.D.Ind. 1993). At the same time, however, two other district courts have implicitly reasoned CERCLA preempts state repose statutes regardless of whether they conflict with CERCLA under the circumstances of the case. *See Stychno v. Ohio Edison Co.*, 806 F.Supp. 663, 669 & n. 5 (N.D.Ohio 1992); *United States v. Distler*, 741 F.Supp. 643, 646–47 (W.D.Ky1990).

Although Plaintiffs' position is not without appeal and is supported by general phrases from Supreme Court cases, the Court is wary of accepting the argument preemption depends upon the facts of each case. Following this reasoning would mean that, in any given case, resolving the issue of preemption would depend upon the corporate law of the state under which the defendant was incorporated. Tying the resolution of this question to the law of fifty different states would create uncertainty in the law and lead to inconsistency in the application of CERCLA liability.

Such uncertainty is avoided, however, if CERCLA is held to preempt state statutes of repose in general. Rather than depending on divergent state laws, federal courts can apply the federal common law to resolve this issue. Under this approach, courts can continue to develop a uniform, national rule to apply in cases where a defendant corporation is dissolved.

In reaching this conclusion, the Court joins a growing list of courts who have found CERCLA preempts state law in this situation. *See Barton Solvents, Inc. v. Southwest Petro–Chem, Inc.,* 836 F.Supp. 757, 761 (D.Kan.1993); *BASF Corp. v. Central Transport, Inc.,* 830 F.Supp. 1011, 1013 (E.D.Mich. 1993); *Bancamerica Commercial Corporation v. Mosher Steel of Kansas, Inc.,* 1993 WL 370817, *1 (D.Kan.1993); *City and County of Denver v. Adolph Coors Co.,* 813 F.Supp. 1471, 1474–75 (D.Colo.1992); *Stychno v. Ohio Edison Co.,* 806 F.Supp. 663, 669 (N.D.Ohio 1992); *Traverse Bay Area Intermediate Sch. Dist. v. Hitco, Inc.,* 762 F.Supp. 1298, 1301 (W.D.Mich.1991); *United States v. Distler,* 741 F.Supp. 643, 646 (W.D.Ky.1990); *United States v. Sharon Steel Corp.,* 681 F.Supp. 1492, 1496–98 (D.Utah 1987); *but see Levin Metals Corp. v. Parr–Richmond Terminal Co.,* 817 F.2d 1448 (9th Cir.1987) (holding CERCLA does not preempt California's corporate capacity statute). Having found CERCLA preempts South Carolina's statute of repose, the Court now determines whether under the federal common law Goldberg is amenable to suit under CERCLA.

■ In the leading case on this issue, the court in *Sharon Steel* drew a distinction between corporations that are only "dead," and those that are "dead and buried." *Sharon Steel,* 681 F.Supp. at 1498. If a corporation has formally dissolved but not yet completed distributing its assets, then the corporation is merely "dead." *Id.; Hitco,* 762 F.Supp. at 1301; *Distler,* 741 F.Supp. at 646. Under these circumstances, a corporate *res* remains to pay for cleanup costs and further the goals of CERCLA. *Sharon Steel,* 681 F.Supp. at 1498. Hence, dissolved corporations which have not distributed their assets may be sued under CERCLA. *Barton Solvents,* 836

F.Supp. at 761. On the other hand, if a corporation has dissolved and finished distributing its assets, then it is "dead and buried." *Sharon Steel,* 681 F.Supp. at 1498; *Barton Solvents,* 836 F.Supp. at 761. In this situation, there is no entity to sue or defend a suit, and there are no assets to satisfy any CERCLA judgment. *Hitco,* 762 F.Supp. at 1301. "Dead and buried" companies are therefore not amenable to suit under CERCLA. *Id.; Barton Solvents,* 836 F.Supp. at 761.

The "dead and buried" rule properly defines when a dissolved corporation should be subject to suit under CERCLA. In the instant case, Goldberg contends it is "dead and buried" and hence entitled to summary judgment against Plaintiffs. Plaintiffs argue Goldberg's cross-motion for summary judgment must be denied because genuine issues of material fact exist as to whether Goldberg is in fact dead and buried.

■ The record indicates Goldberg filed articles of dissolution with the South Carolina Secretary of State on February 6, 1989. Under South Carolina law, Goldberg's dissolution became effective upon the filing of these documents. *See* S.C.Code Ann. § 33–14–103 (Law Co-op.1993). Though Goldberg claims its assets were distributed in December 1988, the only evidence of distribution is Addlestone's statement to this effect in his affidavit. Plaintiffs argue this is insufficient proof of distribution. Plaintiffs further complain Goldberg has failed to respond properly to Plaintiffs' interrogatories and requests for production regarding the whereabouts of the company's assets.

■ After reviewing the record, the Court agrees with Plaintiffs. While it is uncontroverted Goldberg dissolved as a corporation in February 1989 [15], a genuine issue

15. Aside from contesting the issue of distribution, Plaintiffs also debate whether Goldberg has satisfied South Carolina's requirements for dissolution. In particular, Plaintiffs interpret South Carolina's corporate law as requiring companies to publish notice of their dissolution in a local newspaper before they can be legally "dissolved." Since the record contains no evidence Goldberg published such notice, Plaintiffs argue there is a genuine issue of material fact as to

whether Goldberg is properly dissolved under South Carolina law.

The Court, however, does not interpret South Carolina law as requiring companies to publish a notice of dissolution before they can be legally dissolved. Rather, a company voluntarily "dissolves" after its shareholders or board of directors approve dissolution and the company delivers articles of dissolution to the Secretary of State. *See* S.C.Code Ann. §§ 33–14–102 and –103 (Law.Co-op.1993). Publication of notice

of material fact exists as to whether Goldberg has distributed its assets. The court finds Goldberg has not adequately responded to Plaintiffs' request for documents concerning the alleged sale of Goldberg's assets in 1988 to Charleston Steel & Metal Co. Plaintiffs are entitled to discover whether Goldberg has in fact distributed its assets and is therefore "buried." *BASF Corp.,* 830 F.Supp. at 1013; *Stychno,* 806 F.Supp. at 670. Furthermore, the Court cannot grant summary judgment based on Goldberg's bare claim, contained in Addleston's affidavit, that the company distributed all its assets in 1988. *See Barton Solvents,* 836 F.Supp. at 762; *BASF Corp.,* 830 F.Supp. at 1013. Granting summary judgment to Goldberg would be improper where the company has not permitted Plaintiffs to discover whether the company has any undistributed assets.

In sum, based on finding CERCLA preempts South Carolina's repose statute and the "dead and buried" rule governs this case, the Court DENIES Plaintiffs' motion for summary judgment against Goldberg. The Court, however, also DENIES Goldberg's cross-motion for summary judgment. Moreover, the Court treats Plaintiffs' response to Goldberg's motion as a motion to compel production of documents regarding the sale and distribution of Goldberg's corporate assets. The Court accordingly ORDERS Goldberg to produce the requested documents, if they exist. Although the Court denies the parties' motions for summary judgment at this time, either Plaintiffs or Goldberg may refile their motion after Plaintiffs have had an opportunity to discover whether Goldberg has any undistributed assets.

### D. Goulding Scrap and the "Third Party" Defense of § 107(b)(3)

Defendant Goulding Scrap Material, Inc. (Goulding) has both responded to Plaintiffs' motion for summary judgment and filed a cross-motion for summary judgment. Goulding's cross-motion is predicated on the now familiar argument that it did not "arrange for" the disposal of hazardous substances when it sold batteries to Sapp. As explained earlier, the Court rejects this argument and therefore DENIES Goulding's cross-motion. At the same time, however, Goulding argues the Court must deny Plaintiffs' motion because Plaintiffs have not demonstrated Goulding cannot assert the "third party" defense.

Goulding is a scrap metal dealer located in Pensacola, Florida. In 1978 and 1979, Goulding sold spent batteries to Sapp on several occasions. Like the other sales at issue, Sapp picked the batteries up at Goulding's place of business and after the sale, Goulding retained no interest in the batteries. Though Goulding admits it knew Sapp was a battery recycler, Goulding claims it had no reason to question Sapp's methods. On Goulding's inquiry, Sapp represented it was properly licensed by the state of Florida. Goulding therefore had no reason to suspect Sapp's methods violated environmental laws or were otherwise damaging the environment.

In subsection (b) of § 107, CERCLA provides three affirmative defenses to liability imposed under subsection (a). Subsection (b) reads:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if

only becomes an issue if the company wants to avail itself of South Carolina's five-year limitation on suits against a dissolved company. *See id.* at § 33–14–107. Since CERCLA preempts South Carolina's repose statute, the issue of whether Goldberg published notice of its dissolution is irrelevant.

the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could forseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C.A. § 107(b) (West 1983). Goulding does not claim the release of hazardous substances at the Site was due to "an act of God" or "an act of war." Rather, Goulding asserts the contamination resulted "solely" from the act of a "third party" and hence Goulding has a defense to liability under § 107(b)(3).

■ Before addressing the merits of Goulding's affirmative defense, however, the Court must first dispel Goulding's misconception of its burden of proof on summary judgment. In its brief, Goulding claims Plaintiffs "carr[y] the initial burden of demonstrating that Goulding can present no facts supporting its [third party] defense at trial."[16] To the contrary, it is Goulding who bears the burden on summary judgment of bringing forward evidence supporting this defense.

In plain terms, § 107(b) imposes on the person asserting an affirmative defense the burden of proving "by a preponderance of the evidence" the defense exists. *See id.* Thus, under CERCLA, the *defendant* bears the burden of proof at trial in establishing a defense under § 107(b)(3). The Supreme Court, in assessing the burden of proof on summary judgment under Rule 56(c), stated:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to estab-

lish the existence of an element essential to that party's case, and *on which that party will bear the burden of proof at trial.*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (emphasis added). The Court further reasoned:

[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.

*Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis original).

Since Goulding bears the burden of proof at trial on its third-party defense, it is obligated to bring forward evidence on summary judgment supporting this defense if it seeks to fend off Plaintiffs' motion. Plaintiffs do not, as Goulding implies, have to affirmatively "negate" the basis of this defense to prevail on their motion. Whether at summary judgment or at trial, Goulding bears the burden of proof on this issue. *See United States v. Bliss,* 667 F.Supp. 1298, 1304–05 (E.D.Mo. 1987).[17]

■ Turning to the merits of Goulding's defense under § 107(b)(3), the Court concludes Goulding has not carried its burden so as to forestall summary judgment for Plaintiffs. First and foremost, the record indicates a "contractual relationship" existed between Goulding and Sapp Battery. To establish a third party defense, Goulding must demonstrate the release of hazardous substances was not caused "in connection with a contractual relationship, existing directly or indirectly," between Goulding and Sapp Battery. *See* 42 U.S.C.A. § 107(b)(3).

Here, it is uncontroverted Goulding sold spent batteries to Sapp. While Goulding correctly characterizes the parties' relationship as "purchaser and seller," Goulding cannot escape the fact that a "contractual relationship" existed between the parties. An agree-

---

**16.** Def.'s Mem. in Resp. to Pl.'s Mot. for Summ.J. at 6.

**17.** The cases cited by Goulding in support of its characterization of the burden of proof are wholly inapposite. As demonstrated above, Goulding

has misconceived the Supreme Court's teachings in *Celotex.* Furthermore, *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167 (5th Cir.1990) and *United States v. Maryland Bank & Trust Co.,* 632 F.Supp. 573 (D.Md.1986) simply do not support Goulding's view.

ment to sell batteries, like any other sales agreement, is a "contract" no matter how quickly it is formed or how promptly it is completed. Furthermore, the release of lead and acid at the Site was "in connection with" this sales contract. The batteries Goulding sold to Sapp were ultimately broken open at Sapp's facility in Cottondale, Florida. When the batteries were broken and the battery casings discarded, lead and acid were released into the environment. Stated differently, if Goulding had not sold its batteries to Sapp, there would have been less contamination at the site. Under these circumstances, the Court concludes the release of hazardous substances at the site was "in connection with" the "contractual relationship" between Goulding and Sapp.[18]

 While this finding prevents Goulding from employing the "third-party" defense, the Court also concludes Goulding did not take the necessary "precautions" under § 107(b)(3)(b). Parties seeking to establish a third-party defense must show they "took precautions against foreseeable acts or omissions of any such third party and the consequences that could forseeably result from such acts or omissions." 42 U.S.C.A. § 107(b)(3)(b). Here, Goulding admits that after it sold batteries to Sapp, it did not attempt to discover how Sapp broke open the batteries or disposed of the crushed battery casings. Given these batteries were to be recycled, it was foreseeable that after recovering the lead from the batteries Sapp would have to dispose of the battery casings. It was the careless, haphazard disposal of battery casings on the Site which caused the release of lead into the soil and waters of the Sapp Battery property. Moreover, the record indicates Sapp's disposal practices would have been obvious to anyone who visited the Site.[19] By not even viewing the Sapp property, Goulding failed to take any precaution against Sapp's environmentally-hazardous disposal practices.

Thus, the Court concludes there is no genuine issue of material fact as to Goulding's claimed "third party" defense under § 107(b)(3). As a matter of law, the Court concludes Goulding is not entitled to assert this defense, and therefore summary judgment in favor of Plaintiffs is proper.

*IV. Declaratory Judgment under § 113(g) of CERCLA*

 In their motion for summary judgment, Plaintiffs have moved for a declaratory judgment pursuant to § 113(g)(2) of CERCLA that Defendants are liable for all future response costs Plaintiffs incur in cleaning up the Site. Several defendants, including Goulding, argue Plaintiffs are not entitled to a declaration that they are individually liable

---

18. The cases Goulding cites in its brief, *Shapiro v. Alexanderson*, 743 F.Supp. 268 (S.D.N.Y.1990) and *United States v. A & N Cleaners and Launderers, Inc.*, 788 F.Supp. 1317 (S.D.N.Y.1992), do not undermine this conclusion.

In *A & N Cleaners*, the court did not reach the issue of whether certain conduct was "related to" a contract because the court found no "contractual relationship" even existed between the relevant parties. *See A & N Cleaners*, 788 F.Supp. at 1327–28. Given this Court's conclusion Sapp had contract with Goulding, the reasoning of *A & N Cleaners* does not go far enough to benefit Goulding.

In *Shapiro* on the other hand, the court reasoned the release of hazardous substances at the site was not "connected with" the lease between the parties because the conduct leading to the release occurred *after* the lease had expired and the owner had once again assumed control over the property. *Shapiro*, 743 F.Supp. at 271. This Court agrees that under the circumstances outlined in *Shapiro*, the release was not "connected

with" the prior lessor-lessee relationship. The lessor-lessee relationship at issue in *Shapiro*, however, is hardly akin to the "purchaser and seller" relationship in the instant case. Whereas the timing of the release vis-a-vis the period of the lease was relevant in *Shapiro*, the fact that Sapp broke the batteries after it had completed its purchases from Goulding is not important here. As explained in the text above, the Court has no difficulty concluding the release of lead and acid at the Sapp Battery site resulted in part from Goulding's sales of batteries to Sapp in 1978 and 1979.

19. Goulding, like several other defendants, disputes Plaintiffs' assertion the environmentally-damaging nature of Sapp's disposal methods would have been obvious to anyone who viewed the Site at the time. Plaintiffs rely on Otis Corbin's deposition to establish this fact, and the Court finds Corbin's deposition supports this contention. The Court further notes this fact is supported by the report entitled "Final Report, Sapp Battery Removal" attached as Exhibit 4 to Plaintiffs' motion for summary judgment.

*for "all" future response costs. These defendants, however, misconstrue the nature of the requested declaratory judgment.*

In any "initial action" for recovery under § 107 of CERCLA, courts are *required* to "enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C.A. § 9613(g)(2) (West 1994); *Kelley v. E.I. DuPont De Nemours and Co.*, 17 F.3d 836, 844 (6th Cir.1994). Plaintiffs, in their motion for summary judgment, have not moved on the issue of damages or on the allocation of those damages. Rather, Plaintiffs seek summary judgment on the issue of liability and a declaratory judgment on liability that "will be binding on any subsequent action or actions." In entering a declaratory judgment on liability, the Court *is not* making any determination regarding the amount or allocation of damages in this case. The Court reserves ruling on the issue of damages until a later date. Thus, the defendants' concern regarding the scope of the Court's declaratory judgment is misplaced.

*V. Conclusion and Summary*

In ruling on Plaintiffs' motion, the Court is aware that holding Defendants strictly liable under CERCLA today for conduct occurring back in 1978, 1979 and 1980 would strike many as "unfair." The Court does not dispute that at the time Defendants sold batteries to Sapp, they did not do anything immoral, unethical or even illegal.

Yet, the constitutionality of CERCLA's retroactive application is well-settled. *Monsanto*, 858 F.2d at 174; *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726, 733–34 (8th Cir.1986); *United States v. Amtreco, Inc.*, 809 F.Supp. 959, 970 (M.D.Ga.1992). Moreover, in draft-

ing the broad liability provision of § 107(a), Congress made a policy decision regarding who should bear the cost of cleaning up this country's toxic waste sites. While the Court does not question that policy choice, this case illustrates better than most the potentially harsh results of CERCLA's scheme.

The Court's rulings in this order can be summarized as follows:

(1) Plaintiffs' motion for summary judgment against Defendants C. Brown and Mandy Sapp is GRANTED.

(2) Plaintiffs' motion for summary judgment against those defendants [20] who failed to respond to the motion is GRANTED based on the above discussion and the record.

(3) With the exception of Defendant William R. Mambourg, Plaintiffs' motion for summary judgment against those defendants [21] whose only defense is they did not "arrange for" the disposal or treatment of hazardous wastes as defined in § 107(a)(3) is GRANTED.

(4) Plaintiffs' motion for summary judgment against Defendant William R. Mambourg is DENIED. Defendant Mambourg's cross-motion for summary judgment is likewise DENIED.

(5) Defendant Charles Cleveland's motion to dismiss for lack of personal jurisdiction is DENIED. Plaintiffs' motion for summary judgment against Cleveland is GRANTED.

(6) Plaintiffs' motion for summary judgment against Defendant N. Goldberg Co. is DENIED. Goldberg's cross-motion for summary judgment is also DENIED. In addition, Goldberg is ORDERED to produce the documents described above. Goldberg and/or Plaintiffs may file renewed motions for summary judgment on the issue of Goldberg's liability once Goldberg has com-

---

**20.** Bayside Metals, Inc.; Blattner Metals, Inc.; Eugene Corbin, d/b/a Corbin Battery; Davco, Inc.; DeMark, Inc; Robert R. Anderson, f/d/b/a Anderson Battery; John R. Crowley & Bros., Inc.; K.O. Miller, f/d/b/a Lakewood Battery Co.; Cliff Tew, Billy Tew, Fernie Lamb and William Lamb, individually and as co-partners of Esto Salvage Yard, a general partnership; Carl Gibson, Sr., d/b/a Gibson Metals; Percy Holifield, d/b/a Holifield Battery; James Holifield, d/b/a Holifield

Battery & Radiator; Posey Distributing Co., Inc.; and J.M. Warren, d/b/a Warren Scrap Metal Co.

**21.** American Iron & Metal Co., Inc.; Ben Shemper & Sons, Inc; O.C. Causey, Jr.; Hillary Jowers, f/d/b/a Jowers Battery; Lampp Battery Sales, Inc.; Main Metal Co.; Owens Scrap Metal, Inc.; Buddy Dueitt, d/b/a Dueitt Battery Co.; and West Florida Scrap Metal, Inc.

plied with the Court's order to produce discovery.

(7) Defendant Goulding Scrap's cross-motion for summary judgment based on the "third-party" defense is DENIED. Plaintiffs' motionfor summary judgment against Goulding is GRANTED.

Pursuant to 42 U.S.C. § 9613(g)(2), the Court further DECLARES the defendants found liable by this order will be liable for future response costs and damages, properly recoverable under CERCLA, in regards to the Sapp Battery Site.