**The EKOTEK SITE PRP COMMITTEE, Plaintiff,**

v.

**Steven M. SELF, et al., Defendants.**

**No. 94–C–277K.**

United States District Court,
D. Utah,
Central Division.

March 24, 1995.

Lawrence J. Jensen, of Holland & Hart, Salt Lake City, UT, Robert M. Pomeroy, Jr., Paul D. Phillips, and Steven W. Black, of Holland & Hart, Denver, CO, for plaintiff.

Douglas J. Parry and Bret F. Fandall, of Parry, Murray, Ward & Moxley, Joy L. Clegg, of Snow, Christensen & Martineau, Salt Lake City, UT, Allan D. Brock, of Carter, Brock & Hinman, P.A., Boise, ID, for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

The present action arises from the operation of a used oil refinery in Salt Lake City, Utah. The refinery was owned from 1953 by the O.C. Allen Oil Company. In 1968, the refinery was purchased by Flinco, Inc., which owned the property until it was purchased in 1978 by Steven M. Self and Steven F. Miller, by means of their company, Ekotek, Inc., a Delaware corporation. Ekotek declared bankruptcy in 1987. The site was leased by Petrochem Recycling Corporation from 1987 until February of 1988, when all operations ceased after the Utah Bureau of Hazardous Waste and the Utah Bureau of Air Quality issued notices of various violations.

The Environmental Protection Agency (EPA) assumed control of the site in November of 1988 and began an emergency removal to abate the release of hazardous substances. The EPA subsequently listed the site pursuant to § 105 of the Comprehensive Environmental Response, Compensation & Liability Act (CERCLA), 42 U.S.C. § 9605, on the CERCLA National Priorities List (NPL), 40 CFR Part 300, App. B.

The main activity at Ekotek was the reprocessing of used motor oil, and over 90% of the material shipped to the site was used motor oil. There were approximately 60 above-ground storage tanks at Ekotek, many of which held used motor oil for reprocessing. A fire destroyed the Ekotek refinery in 1981, and it was rebuilt by Ekotek sometime in 1982. Prior to the fire, Ekotek had employed an acid-based process for recycling used oil. Afterwards, the company adopted a distillation process.

The reprocessing of used oil generates waste products, which include organic vapors emitted into the air, acid sludge, spent clay and distillation bottoms. Testing of the used oil at Ekotek showed that it had hazardous materials which were either absent from, or in greater concentrations than, unused petroleum products. The parties have stipulated that various hazardous substances were re-

leased into the soil and groundwater by Ekotek, including benzene, toluene, ethylbenzene and xylenes (or BTEX); polynuclear aromatic hydrocarbons (PAHs); polychlorinated biphenols (PCBs); chlorinated solvents; and heavy metals.

When used in internal combustion engines, motor oil becomes contaminated through the heat of the engine, the absorption of combustion products, and the addition of various metals to the oil due to wear on the engine's components. Of hazardous substances normally found in motor oil (lead and other heavy metals, benzo(a) pyrene, toluene), usage results in the higher concentration of these substances. Used motor oil also acquires hazardous substances not normally found in unused motor oil (including chlorinated solvents, cadmium, and other heavy metals).

The plaintiff Committee is composed of 49 corporations organized under the laws of various states. The Committee was formed in 1988 to respond to a notification from the EPA regarding the Ekotek site, and to negotiate with the EPA to undertake certain investigation and environmental response activities at the site. The liaison defendants are a group which includes other parties alleged to have contributed to the contamination of the Ekotek site.

The main motions now before the court are the competing motions for summary judgment filed on behalf of the plaintiff Committee and by the liaison defendants. In addition to the motion submitted by the liaison defendants, a large number of other defendants have submitted motions joining in whole or in part with the arguments advanced by the liaison defendants. [American Barrel & Cooperage Co., Elton Hayner, Williams Refining Co., Coast Oil Co., G & K Service Inc. (Dkt. No. 249), H & M Oil Co. (Dkt. No. 256), Jet Star Industries, alleged to be Quaker State Franchise Site 1024 (Dkt. No. 258), Morrison Knudsen (Dkt. No. 263), Horne Construction (Dkt. No. 267), Buds Oil Svc. (Dkt. No. 268), Const. Rental & Sup. (Dkt. No. 282), Rocky Mountain Machinery Co. (Dkt. No. 288), All We Oil Co. (Dkt. No. 289) ].[1]

In addition to the other arguments advanced in their motion for summary judgment, the liaison defendants also contend that various defendants should be dismissed since they have settled their liability with the EPA. The Committee has subsequently filed four notices of dismissal as to various settling defendants. Finally, a number of defendants have submitted motions which raise separate and independent issues. There have been two motions to dismiss for lack of personal jurisdiction. (Dkt. No. 130, Les Mai and the Grease Monkey; and Dkt. No. 155, Fuel Processors, Inc.). Three defendants have moved for summary judgment on the grounds that they are dissolved corporations without assets and therefore are not subject to liability under CERCLA. (Dkt. No. 234, B & R Oil Inc. and Halverwood Co.; and Dkt. No. 265, Jet Star, Inc.). Another defendant has moved for summary judgment on the ground that it did not contribute to any of the contamination of the Ekotek site or the surrounding area. (Dkt. No. 261, Bloomfield Refining).

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plain-

1. Defendants Williams Refining and G & K Services, Inc., subsequent to the filing of motions for summary judgment, have filed notice of a de minimis settlement with the EPA, stating an understanding that pending completion of the settlements the action against them will be dismissed. The present order is issued upon the best information available to the court as to the current status of all parties; should it appear that additional parties have settled their liability during the interim, the present order may be modified to so reflect.

tiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

On February 13, 1995, the court conducted a hearing in which the parties were extended the opportunity to present argument relating to the various motions before the court. The court has subsequently withheld any ruling in the matter until the final disposition of the matter in *United States v. Colorado & Eastern Rd. Co.*, 50 F.3d 1530 (10th Cir.1995). With the filing of this opinion by the Court of Appeals, this court will now address the matters submitted herein.

*Section 107 Action*

■ The parties have filed competing motions over the issue of whether a potentially responsible party, such as the Committee, can bring an action under CERCLA § 107(a). In addition to bringing a motion for summary judgment premised in part on the issue, the liaison defendants have also filed a motion to dismiss raising the same issue. The liaison defendants contend that, as a potentially responsible party, the Committee is limited to an action for contribution under § 113(f). The Committee argues that it is entitled to bring the present action under either portion of the statute.

Most of the reported decisions addressing the issue have occurred at the district court level. One group of decisions has concluded that a responsible party is not barred from bringing an action under § 107(a). *See Companies for Fair Alloc'n v. Axil Corp.*, 853 F.Supp. 575, 579 (D.Conn.1994); *United States v. SCA Serv. of Indiana, Inc.*, 849 F.Supp. 1264, 1270 (N.D.Ind.1994); *Barton Solvents, Inc. v. Southwest Petro–Chem, Inc.*, Case No. 91–2382–GTV, 1993 WL 382047 at 2 (D.Kan. Sept. 14, 1993); *Chesapeake & Potomac Telephone Co. of Va. v. Peck Iron & Metal*, 814 F.Supp. 1269, 1277 (E.D.Va.1992); *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 691 F.Supp. 1100, 1118 (N.D.Ill.1988); *Chemical Waste Mgt. v. Armstrong World Indus.*, 669 F.Supp. 1285, 1292 (E.D.Pa. 1987). These decisions have rested on the finding that § 107(a)'s language permitting an action to be brought by "any other person" is not limited by any provision in the statute, and should be read literally to include responsible parties. Other courts have rejected this conclusion and held that a responsible party may not bring an action under § 107(a). *United Technologies Corp. v. Browning Ferris Indus.*, Civil No. 92–0206–B, 1993 WL 660007, 1993 U.S.Dist. LEXIS 19162 (D.Me. May 27, 1993), *aff'd*, 33 F.3d 96 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *City and County of Denver v. Adolph Coors Co.*, 829 F.Supp. 340, 346 (D.Colo.1993); *Avnet, Inc. v. Allied–Signal, Inc.*, 825 F.Supp. 1132 (D.R.I.1992); *United States v. ASARCO, Inc.*, 814 F.Supp. 951 (D.Colo.1993); *Dravo Corp. v. Zuber*, 804 F.Supp. 1182, 1187 (D.Neb.1992), *aff'd*, 13 F.3d 1222 (8th Cir. 1994); *Transtech Indus. v. A & Z Septic Clean*, 798 F.Supp. 1079 (D.N.J.1992), *appeal dismissed*, 5 F.3d 51 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994).

In November of 1994, the Tenth Circuit issued its opinion in *United States v. Colorado & Eastern Rd. Co.*, Case No. 94–1041, 1994 WL 647329 (10th Cir.1994), one of the few circuit court decisions to directly touch upon the present issue. The November opinion was subsequently withdrawn by the court, and replaced by its new opinion in *United States v. Colorado & Eastern Rd. Co.*, 50 F.3d 1530 (10th Cir.1995). As indicated earlier, the court has suspended any ruling in the present matter until the filing of the new opinion in *Colorado & Eastern Rd.* The new opinion does not materially alter the conclusion reached in its previous opinion, holding that potentially responsible parties or PRP may not bring an action under § 107(a) against other PRPs. The action arose from an EPA § 107 cost recovery proceeding against several PRPs. The defendant PRPs filed several cross-claims among themselves, all of which were settled or dismissed prior to trial, except the action for cost recovery under CERCLA § 107(a) brought by Farmland Industries. After a trial, the district court awarded Farmland $734,058.30 in response costs against the other PRPs. The Court of Appeals reversed this award, finding that the correct vehicle for recovery was § 113, not § 107(a). The court stated the appellant PRPs "contend that the district court erred in allowing Farmland to recover under § 107 since cost recovery between PRPs in these circumstances is a claim for contribution under 113(f). We agree." 50 F.3d at 1534. The court stated:

> Furthermore, were PRPs such as Farmland allowed to recover expenditures incurred in cleanup and remediation from other PRPs under 107's strict liability scheme, 113(f) would be rendered meaningless.

> Whatever label Farmland may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make. Accordingly, we hold that Farmland's claim is controlled by 113(f) and that the district

court erred in allowing Farmland to proceed and recover under 107.

50 F.3d at 1536.

The Committee attempts to distinguish *Colorado & Eastern Rd.*, as well as the district court decisions taking a similar position, on two grounds. First, that in those cases the responsible parties had not, like the Committee, "voluntarily" incurred response costs by assisting in the cleanup operations of the various sites, and second, that the plaintiffs in those actions were suing parties which had already settled their liability with the EPA.

The Committee's arguments have been found persuasive by other courts. *See Companies for Fair Alloc'n*, 853 F.Supp. at 580 (making similar distinctions). But *Colorado & Eastern Rd.* cannot be disposed of on such a basis; the broad language of the court's opinion prevents such an interpretation. The existence of such settlements plays no substantial role in the court's discussion of the issue. Rather, as the opinion makes clear, the decisive point was Farmland's status as a responsible party, expressed in the following syllogism: "There is no disagreement that both parties are PRPs by virtue of their past or present ownership of the site; therefore, any claim that would reapportion costs between these parties is the quintessential claim for contribution." *Colorado & Eastern Rd. Co.*, 50 F.3d at 1536. That it is the plaintiff's *status* as a PRP, and not the degree of voluntariness with which it initiated cleanup activity or the settling status of other PRPs, which is controlling may be seen in the court's simple and straightforward approach to the issue, and its conclusion that "claims between PRPs to apportion costs between themselves are contribution claims pursuant to 113 regardless of how they are pled." *Id.*, at 1539.

Accordingly, the court finds that the Committee's claims for relief herein are restricted to a contribution action under § 113(f). The liaison defendants contend that any action under § 113(f) is time barred under the three-year limitations provision contained in CERCLA § 113(g)(3). They argue the Committee's claims for contribution are untimely

since they were brought more than three years after a 1989 agreement between the EPA and Committee members.[2]

However, even though the statute of limitations for contribution claims under § 113(g)(3) is shorter than the six years normally accorded claims for cost recovery under § 113(g)(2), it is still important to note that the statute begins to run only when certain conditions are met. Section 113(g)(3) provides:

> No action for contribution for any response costs or damages may be commenced more than 3 years after—
>
> (A) the date of judgment in any action under this chapter for recovery of such costs or damages, or
>
> (B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

There has not been any judgment or judicially-approved settlement. The parties disagree, however, as to the correct interpretation of the 1989 "ADMINISTRATIVE ORDER ON CONSENT FOR EMERGENCY SURFACE REMOVAL" entered into between the EPA and certain respondents who include members of the current PRP Committee, and whether this order reflects "an administrative order under ... 42 U.S.C. § 9622(h)." CERCLA § 122(h)(1) provides authority for EPA agents to "settle a claim under section 9607 of this title for costs incurred by the United States Government if the claim has not been referred to the Department of Justice for further action." 42 U.S.C. § 9622(h)(1).

The liaison defendants support their argument by fastening on to various portions of the August 2, 1989 Consent Order, noting for example, that the order requires the respon-

dents to reimburse the EPA for "the full amount of the costs" incurred by the EPA in connection with the Consent Order. (Ex. A at 22). Under Article XVII of the Consent Order, the EPA provides a covenant not to sue respondents complying with the terms of the order. Further, Article XXII of the Consent Order provides that when the respondents have complied with their obligations under the order, they "shall not be liable to any other person or entity for claims of contribution regarding the matters addressed in this Consent Order." In reaching this position, Article XXII explicitly references 42 U.S.C. § 9613(f)(2), which provides for settlor immunity from contribution claims. It is this protection which was the purpose of the Consent Order from the point of view of the respondents, who "are consenting to this Consent Order to avoid the costs of litigation of the matters set forth herein." (Ex. A at 3).

■ Nonetheless, the court finds that the 1989 Consent Order may be reasonably seen only as a § 106 order. The order does not absolve the respondents from liability for future costs expended at the site, but in fact reserves a right to proceed against the respondents for future costs or to the extent that the requirements of the order are not fulfilled. The Consent Order in fact reserves a right to bring a cost recovery action for "any past and future costs incurred by the United States in connection with any response activities conducted or to be conducted at the Facility, other than those response activities completed pursuant to this Consent Order to the satisfaction and approval of EPA." (Consent Order at 24).

More importantly, the language and circumstances surrounding the Consent Order are inconsistent with any understanding that the order is other than a § 106 order. The EPA's power to issue orders pursuant to § 106 is very broad, and allows the agency to do whatever "may be necessary to protect

---

**2.** The plaintiff Committee also argues that it is not the 3–year limitations period of § 113(g)(3) that controls, but the 6–year period under § 113(g)(2), as an action "for recovery of costs referred to in [Section 107]." The court cannot agree with the Committee's argument, and finds that § 113(g)(3), which explicitly deals with

claims for contribution, is the more relevant section, and the one which must be applied here. *See United Technologies v. Browning–Ferris Indus.*, 33 F.3d 96 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995).

public health and the environment," but these broad powers may be utilized only in narrowly defined circumstances: there must be an express executive finding that an actual or threatened release of a hazardous substance poses "an imminent or substantial endangerment to the public health or welfare or the environment." In order to fulfill these objectives of reducing the threat to public health and welfare, CERCLA gives the EPA authority under § 122(a), distinct from § 122(h), to settle claims.

Section 122(h), on the other hand, is more narrowly drawn, and provides authority for the EPA to settle claims with private parties "for costs incurred by the United States." Such settlements, moreover, must be preceded by the publication of a notice of the proposed settlement orders in the Federal Register, and the order may be finalized only after consideration of comments received during a 30–day comment period after publication.

The first page of the Consent Order states that the "Administrative Order on Consent (the Consent Order) is issued ... pursuant to section 106(a)" of CERCLA. Article II's *"STATEMENT OF PURPOSE"* provides that the activities required by the order "will be implemented under section 106(a) of CERCLA." Article VII, providing the operational language of the order, states that the order is made "pursuant to the authority of section 106(a) of CERCLA." The agreement consistently avoids any statement that it is premised, even in part, upon authority granted pursuant to § 122.

Further, the Consent Order appears to be a settlement reached pursuant to the EPA's authority under §§ 106 and 122(a), as opposed to that under § 122(h), in that its expressed and main purpose and requirement was to compel the respondents to assist in cleaning up the site. Such compulsion is not the focus of § 122(h), which is designed for the purpose of allowing the United States

to recoup its expenses. In contrast to the repeated invocation of § 106, the Consent Order is devoid of any mention of § 122(h). Whenever the order indicates its purpose, it consistently states only that it is being issued pursuant to its authority under § 106. The order also consistently states that it is premised upon the finding of imminent and substantial harm, a requirement under § 106, but not a fundamental element of an order under § 122(h).

In sum, the various provisions contained in the Consent Order can all be viewed as consistent with the broad grant of authority for cleanup settlements under §§ 106 and 122(a). Moreover, the Consent Order lacks the characteristic features of a § 122(h) order. The Consent Order does not appear to have been published in the Federal Register, a requirement for § 122(h) orders.[3]

This conclusion is buttressed by a consideration of the rationale underlying the shortened statute of limitations contained in § 122(g)(3). The statute lists three types of events which will trigger the shortened, three-year limitations period for contribution actions: a § 122(g) de minimis settlement, a § 122(h) cost recovery settlement, and a judicially-approved settlement. Each of these has in common a fixing of the total liability faced by a given settlor. Since his own liability has been fixed by such a settlement, Congress could reasonably conclude that such a settlor may be required to bring any claim for contribution sooner than persons whose liability has not been so fixed. In the present case, on the other hand, the provisional nature of the 1989 Consent Order makes it clear that there was no fixing of the respondents' liability. They were required by the order to assist in the clean up of the site and were responsible for future as well as past costs. It could not be known at that time how much the entire operation would cost, or what the full liability of the plaintiffs might be. Such a situation falls outside the

---

**3.** The defendants correctly note that the notification requirements, like other procedures in § 122, can be waived by the President. But this may occur only if there is notification of the waiver: "If the President decides not to use the procedures in this section, the President shall notify in writing potentially responsible parties at

the facility of such decision and the reasons why use of the procedures is inappropriate." 42 U.S.C. § 9622(a) (1994 Supp.) In the present case, there is evidence neither of compliance with the requirements of § 122(h), nor of notification that such procedures were being waived.

justification for the shortened limitations period contained in § 113(g).

*The Petroleum Exclusion*

■ In seeking dismissal of the present action, the defendants also contend that the used oil shipped to Ekotek was not a "hazardous substance" within the meaning of 42 U.S.C. § 9601(14), which defines the term to include a broad range of pollutants, chemicals, and other substances, but excludes from the definition

> petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14).

In determining the potential applicability of this exclusion from the general definition of a hazardous substance under CERCLA, the court finds that the burden of proof is on the defendants to establish their right to the exemption. As a general rule, the burden of proof is on the party seeking to invoke the benefits of an exemption to a general rule of law. *See United States v. First City Nat'l Bank,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967).

The court finds that the various cases cited by the defendants in support of their argument are not helpful here since all involve petroleum products in their refined state, and do not involve used or waste oil. *See Bunger v. Hartman,* 797 F.Supp. 968 (S.D.Fla.1992). Thus, in *Wilshire Westwood Assoc. v. Atlantic Richfield,* 881 F.2d 801 (9th Cir.1989), the Ninth Circuit held that the addition of hazardous substances to gasoline during the refining process did not prevent the application of the petroleum exclusion to the resulting material. But this case clearly dealt only with unused, refined gasoline. The court refused to decide whether the exclusion could apply to petroleum products "which have been contaminated during use." 881 F.2d at 805 n. 5.

This conclusion was repeated in *Southern Pacific Transp. Co. v. California (CALTRANS),* 790 F.Supp. 983 (C.D.Cal.1991), in which the court also concluded that the CERCLA petroleum exemption includes "used petroleum products." This conclusion was expressly limited, however, to instances where the use did not cause an increase in the concentration of hazardous substances. *Id.* at 986. Another case relied upon by the liaison defendants, *Niecko v. Emro Marketing,* 769 F.Supp. 973 (E.D.Mich.1991), *aff'd,* 973 F.2d 1296 (6th Cir.1992), is similarly inapplicable to the present case, since the court there applied the petroleum exclusion to a case which involved, according to the court, "nothing more nor less than leaking gasoline." The various hazardous substances cited by the plaintiffs were found to be "inherent, indigenous component[s] of gasoline." *Id.* at 982. In *United States v. Peirce,* 158 F.R.D. 16, 21 (N.D.N.Y.), *amended and superseded on other gds.,* 159 F.R.D. 369 (N.D.N.Y., 1994), the court concluded that oil would not be protected by the CERCLA petroleum exemption to the extent that it contained hazardous substances "which would be considered non-indigenous *or which resulted from use of the oil.*" (Emphasis added).

Cases which have addressed the problem of used oil have concluded that the substance does not fall within the scope of the petroleum exclusion, where the use of the oil results in the presence of elevated levels of hazardous substances.[4] As the Ninth Circuit has observed, if a hazardous substance "is indigenous to petroleum and is present as a result of the release of petroleum, such substance will fall within the petroleum exclusion *unless* it is present at a concentration level that exceeds the concentration level that naturally occurs in the petroleum product." *Cose v.*

---

4. The commentators have generally agreed that oil contaminated through use does not fall within the protection of the petroleum exclusion. *See* R. Aguiluz, *Refining CERCLA's Petroleum Exclusion,* 7 Tulane Envtl.L.J. 41 (Winter, 1993); C. Knopf, *What's Included in the Exclusion: Understanding Superfund's Petroleum Exclusion,* 5 Fordham Envtl.L.J. 3 (Fall, 1993); L. Bacher, Jr., *When Oil is Not Oil: An Analysis of CERCLA's Petroleum Exclusion in the Context of a Mixed Oil Spill,* 45 Baylor L.Rev. 233, 239 (Spring, 1993).

*Getty Oil,* 4 F.3d 700, 704 (9th Cir.1993) (emphasis in original). *See Lockhart Chem. Co. v. Moreco Energy,* 1992 U.S.Dist. LEXIS 19404 (S.D.Mich.1992); *Mid Valley Bank v. North Valley Bank,* 764 F.Supp. 1377 (E.D.Cal.1991); *Washington v. Time Oil,* 687 F.Supp. 529, 532 (W.D.Wash.1988) (concluding exclusion inapplicable where hazardous substances found "in excess of the amounts that would have occurred in petroleum during the oil refining process").

This interpretation of the petroleum exclusion is consistent with both the legislative history and the administrative interpretations of the exclusion. According to a Senate Report on the scope of CERCLA, "The reported bill does not cover spill or other releases strictly of oil." S.Rep. No. 96-848, 96th Cong.2d Sess. 29-31 (1980). The Third Circuit focused on this report in concluding that the petroleum exclusion was "intended for oil spills, *not for releases of oil which has become infused with hazardous substances through use.*" *United States v. Alcan Aluminum,* 964 F.2d 252, 267 (3d Cir.1992) (emphasis added).

Similarly, the EPA has understood the exclusion not to apply to used oil. In a Final Rule published in 1985, the EPA stated:

> EPA interprets the petroleum exclusion to apply to materials such as crude oil, petroleum feedstocks, and refined petroleum products, even if a specially listed or designated hazardous substance is present in such products. However, EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion.

50 Fed.Reg. 13,460 (April 4, 1985). This position was reiterated in a 1987 EPA Memorandum stating that "the petroleum exclusion does not cover oil which becomes contaminated through use." (Memo. from EPA Gen. Counsel to the EPA Asst. Admin. for Solid Waste & Emergency Response on "*Scope of the CERCLA Petroleum Exclusions Under Sections 101(14) and 104(a)(2),*" at 6 (July 31, 1987)). Reviewing the legislative history of the exclusion, the EPA concluded that "Congress had no intention of shielding from Superfund response and liability hazardous substances merely because they are added, intentionally or by use, to petroleum products." *Id.* at 6. The EPA's interpretations of the scope of CERCLA have been held to be highly persuasive evidence of congressional intent. *See Wilshire Westwood,* 881 F.2d at 809.

As noted earlier, the record indicates that used motor oil contains hazardous substances not contained in, or at levels in excess of that found in, unused oil. Further, the record indicates contamination at the Ekotek site by hazardous substances beyond those contained in unused oil. Under these circumstances, summary judgment in favor of the defendants based upon the petroleum exclusion is inappropriate.

*Generation and Transportation*

The liaison defendants contend that their shipment of used oil to Ekotek does not fall within the scope of CERCLA because the oil was sent for recycling. Because the oil was a useful product, the liaison defendants contend, it is not "waste" within the meaning of CERCLA.

CERCLA § 107(a)(3) imposes liability on:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for the transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3).

Section 101(29) of CERCLA defines "disposal" as having the same meaning as that stated in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), which states that the term means the

> discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

The defendants argue that because used oil is a valuable and useful product, it cannot constitute "waste", and hence the defendants cannot be liable for "disposing" of waste within the meaning of § 107(a)(3). The court finds that the defendants' argument must be rejected. While a number of courts have found an exemption to CERCLA liability for the transfer of useful products, under the circumstances of the present case the useful product defense is not appropriate.

The useful product defense arises where the product alleged to be waste in fact "remains useful for its normal purpose in its existing state." *California v. Summer Del Caribe, Inc.*, 821 F.Supp. 574, 581 (N.D.Cal. 1993). The focus in these cases is not whether the product has some general or residual economic value, but whether the product is still fit to perform the function for which it was created. *See Chesapeake & Potomac Telephone Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1269, 1275 (E.D.Va.1992). The recent case of *United States v. Maryland Sand, Gravel & Stone*, Case No. HAR 89-2869, 1994 WL 541069 (D.Md. Aug. 12, 1994), states the principle well. The court rejected an argument advanced by the defendant generators of industrial chemical solvents, who had transferred the chemicals to a solvent recovery operator, that the transfer represented "recycling" rather than "disposal", and hence did not constitute the activity governed by CERCLA. The court concluded that CERCLA applied to the transaction, since the defendants transferred solvents "for which they had no further use, even when the recipients place[d] some residual value on the waste." *Id.* at *4. The court observed that it was unable to identify any authority for

> the proposition that merely because a valuable substance could, through processing, be reclaimed from an otherwise useless product, that the otherwise useless product was "new and useful" such that CERCLA liability would not attach.

*Id.* at *5 n. 20.

The useful products defense has thus been a shield to defendants where the allegedly hazardous substance is contained in a product which is still useful in fulfilling the purpose for which the product was created. *See AM Internat'l v. International Forging Equip.*, 982 F.2d 989, 999 (6th Cir.1993) (sale of chemicals to be used in the electroplating, heat-treating, and other manufacturing processes); *Florida Power & Light v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir. 1990) (sale of new electrical transformers to utility); *United States v. Gordon Stafford, Inc.*, 810 F.Supp. 182 (N.D.W.Va.1993) (sale of used electrical transformers which were "in working order" and had an "average useful life of at least 12 more years"); *Jordan v. Southern Wood Piedmont Co.*, 805 F.Supp. 1575, 1581 (S.D.Ga.1992) (sale "in ordinary course of business" of wood treatment chemicals to a wood treatment plant); *Kelley v. Arco Indus.*, 739 F.Supp. 354 (W.D.Mich. 1990) (sale of neoprene for use in the manufacture of rubber goods); *Amland Properties v. ALCOA*, 711 F.Supp. 784, 793 (D.N.J.1989) (sale of property containing electrical transformers, deemed a "useful product"); *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651 (N.D.Ill.), *aff'd*, 861 F.2d 155 (7th Cir.1988) (sale of wood treating chemicals to a wood treatment facility); *C. Greene Equip. Corp. v. Electron Corp.*, 697 F.Supp. 983, 987 (N.D.Ill.1988) (sale of electrical transformer equipment "usable when it was sold"). Thus, in a series of cases involving the sale of property or building materials involving asbestos, a number of courts have applied the useful products defense to hold that such sales do not involve "disposal" under CERCLA. *See 3550 Stevens Creek Assoc. v. Barclays Bank*, 915 F.2d 1355 (9th Cir.1990), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991); *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1065 (5th Cir.1990); *Prudential Ins. v. U.S. Gypsum*, 711 F.Supp. 1244 (D.N.J.1989). *Contra United States v. Petersen Sand & Gravel*, 806 F.Supp. 1346 (N.D.Ill.1992).

In contrast with these decisions finding no liability under CERCLA, another series of cases involving recycling operations concluded that such activities are not immune from CERCLA under the useful products defense. *See Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1140 (N.D.Fla.1994) (sale of for

recycling of spent batteries which could no longer supply electrical current, and thus having "no usefulness except as feed material for [the] recycling operation"); *California v. Summer Del Caribe, Inc.,* 821 F.Supp. 574, 581 (N.D.Cal.1993) (recycling of solder dross not manufactured for purpose of sale, but as by product of manufacturing process).

*Chesapeake & Potomac Tel. v. Peck Iron & Metal,* 814 F.Supp. 1269 (E.D.Va.1992), involved the recovery of lead from used batteries. The defendants argued, as the liaison defendants do here, that rather than disposing of waste, they sold the batteries as raw material for the valuable product of lead, which was created by the recycling process. The court rejected the defendants' argument, stating:

> If the defendants had sold unused, and still usable, batteries to an entity which used them in their business operations and then drained battery acid and lead from them—causing damage to the environment—their argument would be meritorious. But the only remaining "use" of the batteries sold by the generator/recycler defendants ... was that lead, a hazardous substance[,] could be reclaimed from them. As batteries, per se, they had no use.

*Id.* at 1275.

In *United States v. Pesses,* 794 F.Supp. 151 (W.D.Pa.1992), the government sought reimbursement for response costs arising from the treatment of a site containing hazardous substances at a scrap metal processor. The defendants in the action sought summary judgment, arguing that they had sold "valuable" scrap metal to the reprocessor, and that their intent was to make a profit from the transaction rather than to dispose of the material. The court rejected the defendants' argument and granted summary judgment to the government, finding that the materials sent to the reprocessor "could not be used for their intended purpose, i.e., could not be used productively without processing." *Id.* at 156–57.

Similarly, in *United States v. A & F Materials,* 582 F.Supp. 842 (S.D.Ill.1984), the court refused to grant summary judgment in favor of defendant, which had transferred a caustic solution produced in the course of the manufacture of jet aircraft, its principal business. The caustic solution was sold to a company which used it to neutralize acidic oil. The court concluded that summary judgment on the issue of whether the caustic solution was "waste" was inappropriate, noting that under CERCLA "the definition of waste was intended to cover those hazardous materials which are of nominal commercial value and which were sometimes sold or reused and sometimes discarded." *Id.* at 845.

■ Given the state of the law, the defendants in the present action are not entitled to invoke the useful products defense. The defendants stress the value of recycled oil, and the national policy is support of the reprocessing of used oil. *See* RCRA, 42 U.S.C. § 6901a, incorporating findings of the Used Oil Recycling Act of 1980, Public Law 96–463, 94 Stat. 2055. But this is irrelevant to the issue here, which is whether these defendants, in selling and transporting used oil to the Ekotek site, arranged for the disposal of waste within the meaning of § 107(a)(3) of CERCLA. As indicated earlier, the useful products defense focuses only upon whether the product is still fit for its original purpose.

Here, neither the original refiners of the oil, nor the automobile owners and other persons who then converted the oil to its "used" status by using it in their engines, did so with the purpose of creating a product which could ultimately be sold for some negligible amount to an oil recycling facility. The used oil created had fulfilled, and was then no longer fit for, its original purpose.

■ And while the defendants repeatedly emphasize that they "sold" the used oil to Ekotek and that they had no knowledge of the conditions of the Ekotek facility, this is irrelevant to the scheme of strict liability created by CERCLA. So long as the defendants are shown to have arranged for the disposal of waste, the characterization of the transfer as a "sale" will not provide protection from liability under CERCLA. *See, e.g., United States v. Petersen,* 806 F.Supp. at 1354.

■ As a brief addendum to their useful products argument under the "disposal" prong of § 107(a)(3), the defendants also put forward the argument that they are not covered by the "treatment" prong of the statute, since the distillation process used by Ekotek, they contend, did not involve any chemical treatment of a hazardous waste.

As with the term "disposal", CERCLA defines "treatment" with reference to the Solid Waste Disposal Act. CERCLA § 101(29). The SWDA defines "treatment" as

any method, technique, or process, including neutralization, designed to change the physical, chemical or biological character or composition of any hazardous waste ... so as to render such waste ... amenable for recovery.

42 U.S.C. § 6903(34).

The stipulations submitted by the parties render it impossible to contend that the processing of used oil by Ekotek was not the treatment of a hazardous waste. In the acid process used by Ekotek until 1982, the used oil was heated in tube furnaces (to remove water and organic compounds), and then mixed with sulfuric acid (to removed additives and nonlubricating components). The oil was then "polished" by heating it with clay to produce different fraction weights of oil. The base oil was then blended with various additives to give the oil antioxidant and detergent qualities. The acid process also resulted in the creation of the tarry substance known as "acid sludge," a collection of sulfated organic matter, metals, lead, residue for antioxidants, polymers from lubricating oils, and detergent additives.

After 1982, Ekotek adopted a new process in which, after the oil was heated, it was subjected to a distillation process to separate the oil into its various components. During the course of this distillation, clay was used to removed carbon from the oil and to improve its color. Given the extensive chemical reworking of the used oil at the Ekotek plant, it is impossible to say that these processes did not constitute treatment of hazardous waste within the meaning of CERCLA.

*Service Station Exemption*

■ A number of defendants have invoked the protections of the service station dealer exemption, codified at 42 U.S.C. § 9614(c)(1). This provision, adopted in 1986 as part of the Superfund Amendments and Reauthorization Act (SARA) P.L. 99–499, 100 Stat. 1613, provides that an exemption from CERCLA liability for service station dealers arises from the release of recycled oil, if the oil

(A) is not mixed with any other hazardous substance, and

(B) is stored, treated or transported, or otherwise managed in compliance with regulations or standards promulgated pursuant to section 3014 of the Solid Waste Disposal Act [42 U.S.C. § 6935] and other applicable authorities.

42 U.S.C. § 9614(c)(1)(A) & (B).

The EPA regulations mandated by SARA in 1986 were adopted in 1992 and did not become effective until March, 1993. 57 Fed. Reg. 41566, 41583–84 (1992), 40 CFR Part 279 (1993). This, of course, was long after the Ekotek site in Utah had been closed and was no longer receiving shipments of used oil from the defendants.

The court can agree with the defendants that the EPA's delay in promulgating the regulations for the disposal of used oil is quite remarkable. Not only was the exemption itself created on October 17, 1986, Congress had previously mandated the creation of the standards for used oil maintenance in 1984 as a part of the Hazardous and Solid Waste Amendments of 1984, providing that

not later than twenty-four months after November 8, 1984, the Administrator shall promulgate such standards under this subsection regarding the generation and transportation of used oil which is recycled as may be necessary to protect human health and the environment.

42 U.S.C. § 6935(c)(2)(A) (1994 Supp.). Indeed, Congress had called on the EPA to adopt standards for the management of used oil as early as 1980. The Used Oil Recycling Act of 1980, P.L. 96–463, 94 Stat. 2055, at 2057, *codified at* 42 U.S.C. § 6935(a) (1994 Supp.), provides that:

Not later than one year after October 15, 1980, the Administrator shall promulgate regulations establishing such performance standards and other requirements as may be necessary to protect the public health and the environment from hazards associated with recycled oil. In developing such regulations, the Administrator shall conduct an analysis of the economic impact of the regulations on the oil recycling industry. The Administrator shall ensure that such regulations do not discourage the recovery or recycling of used oil, consistent with the protection of human health and the environment.

However, the court cannot agree that this delay somehow is a basis for applying the exemption retroactively to the actions of the defendants in shipping used oil to the Ekotek facility. *See Bowen v. Georgetown Univ.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988). The service station dealer exemption expressly provides that the effective date of the exemption "shall be the effective date of regulations or standards promulgated under section 3014 of the Solid Waste Disposal Act" relating to the recycling of used oil. 42 U.S.C. § 9614(c)(4). As indicated earlier, the EPA's standards for the management of used oil did not become effective until 1993. The clear use of the future tense in 42 U.S.C. § 9614(c)(4) reflects an expression of congressional intent barring a retroactive application of the service station dealer exemption.

*Personal Jurisdiction*

The defendants, Grease Monkey and its manager Les Mai, and Fuel Processors seek summary judgment predicated on the alleged lack of personal jurisdiction. The evidence submitted by the parties supports the conclusion that Grease Monkey sent some 46,568 gallons of used oil to Ekotek, and Les Mai sent some 4,023 gallons. Fuel Processors also sold used oil to Ekotek. It further appears that Fuel Processors knew the oil was destined for recycling in Utah. Although, as Fuel Processors stresses, the company had no face to face negotiations with Ekotek management, the record does indicate that it did on several occasions place or receive calls from Ekotek personnel in

Utah, arranging for the disposition of the used oil in Utah.

Defendants Grease Monkey and its franchise manager Mai stress Mai's August 17, 1994 affidavit, and contend that when Mai agreed to transfer the used oil from the Idaho operations, he had no knowledge that the oil would be transported to or used in Utah. The evidence indicates there was a substantial amount of used oil sent from the Grease Monkey operations in Idaho to the Ekotek facility in Utah. The remaining question is the one of knowledge—to what extent did the defendants know that the used oil was destined for treatment in Utah. While Mai emphasizes that he never had contact with Ekotek personnel in Utah, he acknowledges he did speak with Ekotek truck drivers as they passed through Idaho. He states that he did not know whether the used oil would be treated in Utah "or resold for lubrication purposes in Idaho." This latter possibility, however, is simply speculation. There is no evidence that Ekotek ever purchased used oil for immediate resale in other states rather than for transport to Utah.

The remainder of the affidavit establishes that Mai allowed Ekotek drivers to remove the used oil stored at his stations, while knowing or having been informed that Ekotek was an operation which "recycled oil in Salt Lake," and that it "had Federal and State permits to recycle oil at its facility in Salt Lake City, Utah."

Reading the allegations complained of in the complaint as true, it is apparent that, although they were not present physically in the state, the defendants nonetheless have transacted business, supplied goods, and caused injury by supplying used oil to the Ekotek facility within the State of Utah, thereby rendering themselves subject to liability under the Utah long-arm statue. Utah Code Ann. § 78–27–24. The action against the defendants arises out of and is predicated upon these very actions. Further, the imposition of specific jurisdiction based upon these actions by the defendants is consistent with due process, and the imposition of personal jurisdiction over the defendants in Utah is both fair and reasonable. *See Unit-*

ed States v. Conservation Chem. Co., 619 F.Supp. 162 (W.D.Mo.1985).

The court finds instructive the recent case of *Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1152 (N.D.Fla.1994), a CERCLA action involving a battery recycling operation in Florida. One of the defendants, a salvage operator in South Carolina, periodically sold spent batteries to the Florida recycler, which then picked up the batteries and transported them to his Florida plant. The court found that it could exercise personal jurisdiction over the defendant, even though the company had no other contacts with Florida. The court concluded:

Today, the treatment and disposal of hazardous substances is truly a national industry frequently involving waste brokers and middlem[e]n. As a result, hazardous substances are shipped across state lines on a regular basis. To permit defendants like Cleveland to interpose jurisdictional defenses to liability would frustrate the remedial goals of CERCLA. Hence, the shared interests of the states of this nation support exercising jurisdiction over Cleveland in this state.

858 F.Supp. at 1149.

In the present case, the court finds that defendant Fuel Processors had sufficient knowledge that its used oil was to be recycled in Utah, and that the exercise of personal jurisdiction over the defendant in Utah is consistent with constitutional due process. And while Grease Monkey and Les Mai deny any absolute knowledge that their used oil was in fact destined for Utah, the evidence remains clear that on a periodic basis they sold a toxic substance to a company which they knew to be a Utah company, and which was in the business of treating such substances in Utah. The post hoc speculation that they did not absolutely know the toxic substance was to be shipped to Utah is not a sufficient basis for allowing the defendants to escape from jurisdiction in Utah. To the extent that the defendants did not know for certain that the used oil was being shipped to Utah, it is because they steadfastly avoided asking.

The court finds that it would seriously undermine the remedial purpose of CERCLA to provide a forum for prompt resolution of complex and competing claims if certain defendants, who had disposed of toxic substances by selling them to persons they knew to be operating in interstate commerce, were allowed to defeat personal jurisdiction by the simple expediency of turning a blind eye to the actual place of disposal. In the context of actions under CERCLA § 107, the court in *Chatham Steel* observed:

Courts elsewhere have rejected the argument a defendant must have known where or how a hazardous substance was to be disposed of or treated for liability to attach under § 107(a)(3). *United States v. Mottolo*, 695 F.Supp. 615, 626 (D.N.H. 1988); *O'Neil v. Picillo*, 682 F.Supp. 706, 719 n. 2 (D.R.I.1988), *aff'd*, 883 F.2d 176 (1st Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Ward*, 618 F.Supp. 884, 895 (D.C.N.C.1985); *see [United States v.] Fleet Factors*, 821 F.Supp. [707, 724 (S.D.Ga.1993) ]; *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 233–34 (W.D.Mo.1985). Reading a knowledge requirement into § 107(a)(3) would encourage generators to escape liability by "playing dumb" about how their hazardous wastes are disposed of. *Ward*, 618 F.Supp. at 895. This in turn would undermine CERCLA's goal of placing responsibility for the proper treatment and disposal of hazardous substances on those who generate these dangerous compounds and arrange for their disposal or treatment. In short, Defendants cannot eschew their responsibilities under CERCLA merely because they allegedly did not know the location or methods of [the disposer]'s business.

858 F.Supp. at 1142.

The court finds that a similar result should obtain here, and the defendants' motion for summary judgment on the issue of personal jurisdiction will be denied.

### Dead and Buried

Jet Star Industries, B & R Oil, and Halverwood Company have moved for summary judgment contending that, having been dissolved and having distributed their assets,

they are "dead and buried corporations" and thus not subject to CERCLA liability.

CERCLA § 107(a) subjects to liability "any person" who performs the specified activities involving the release of hazardous substances. CERCLA § 101(21) defines "person" as including a corporation, but does not directly speak to the status of dissolved corporations. It has been held that CERCLA preempts state laws governing corporate capacity to be sued. *United States v. Sharon Steel Corp.*, 681 F.Supp. 1492 (D.Utah 1987).

In *Sharon Steel*, the court addressed the status under CERCLA of a dissolved corporation, and concluded that dissolution of a corporation without distribution of the corporation's assets did not immunize the corporation from CERCLA liability. The court both distinguished and explicitly refused to decide what would happen after distribution of the corporation's assets:

> Nor is the court faced with a situation in which the corporation's assets have been fully distributed and its affairs completely wound up, that is, where the corporation is not only dead but also buried. Here, the funeral is still going on.

681 F.Supp. at 1498.

Although *Sharon Steel* itself did not directly resolve the status of dead and buried corporations, most of the recent decisions have both followed the distinction made in that decision and further concluded that once the dead corporation is in the ground, it is no longer a "person" amenable to suit under CERCLA. *Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1152 (N.D.Fla.1994); *AM Properties Corp. v. GTE Products*, 844 F.Supp. 1007, 1012–14 (D.N.J.1994); *Barton Solvents, Inc. v. Southwest Petro–Chem, Inc.*, 836 F.Supp. 757, 761 (D.Kan.1993); *BASF Corp. v. Central Transp. Inc.*, 830 F.Supp. 1011 (E.D.Mich.1993); *Traverse Bay Area Intermed. Sch. Dist. v. Hitco, Inc.*, 762 F.Supp. 1298, 1301 (W.D.Mich.1991). Two cases have found that a corporation's status as dead and buried makes no difference to its potential liability under CERCLA. *United States v. SCA Services of Indiana, Inc.*, 837 F.Supp. 946, 953 (N.D.Ind.1993); *Allied Corp. v. Acme Solvents Reclaiming*, Case No. 86–C–20377, 1990 WL 322940 (N.D.Ill. 1990).

The court finds persuasive the approach of the majority of the decisions, and holds that a dissolved corporation holding no valuable assets is not a person within the meaning of CERCLA. Assuming that they have been dissolved and have relinquished all their assets, the three defendants named are simply not "corporations" in any meaningful sense.

However, the court finds that summary judgment should not be granted at this time because further discovery should be permitted as to the status of the three defendants. Each of the defendants relies heavily on the affidavit testimony of their former presidents, and the record suggests that full discovery upon the issue has not yet been concluded. The issue of whether a dissolved corporation is indeed dead is fact specific and should not be granted until discovery is complete. *Chatham Steel*, 858 F.Supp. at 1152–53; *Barton Solvents*, 836 F.Supp. at 757, 761–62; *BASF*, 830 F.Supp. at 1013. To continue the metaphor, a burial at the present time might prove unpleasantly premature. Accordingly, the court shall withhold summary judgment on this issue for the time being.

IT IS ACCORDINGLY ORDERED this 24th day of March, 1995, that the motions to dismiss and for summary judgment of the liaison defendants, as well as the various independent defendants' motions to join in, are hereby denied, except as to the motions by defendants Jet Star Industries, B & R Oil, and Halverwood Company upon the issue of their status as dead and buried corporations, upon which the court reserves judgment at the present time. The plaintiff's motion for partial summary judgment is granted, with the exception of the seventh and last issue asserting that the plaintiff has stated a claim for response costs under § 107(a), as to which issue the motion is denied.

In the face of the foregoing, the litigants are expected to confer in the interest of reconciling their respective positions. Lead counsel are to timely meet in the interest of revisiting the scheduling order of May 16,

1994, as modified from time to time. Following this, the court will welcome receipt of plaintiff's next status report. Lastly, the court will initiate a status conference with lead counsel, by conference call, on April 28, 1995, at 3:00 p.m. (CDST).